1

1          **UNITED STATES DISTRICT COURT**
        **FOR THE DISTRICT OF NEW JERSEY**
2    ─────────────────────────────

3    **ASSOCIATION OF NEW JERSEY RIFLE**              **CIVIL ACTION NUMBER:**
     **& PISTOL CLUBS, INC., et al.,**
4                    *Plaintiffs*,                   **3:18-cv-10507-PGS-JBD**

5    **vs.**

6    **MATTHEW PLATKIN, in his official**            **ORAL ARGUMENT**
     **capacity as Attorney General of**
7    **New Jersey, et al.,**                         **MOTION HEARING**
                     *Defendants.*
8    ─────────────────────────────

9    **MARK CHEESEMAN, et al.,**                     **CIVIL ACTION NUMBER:**

10   **vs.**                                         **1:22-cv-04360-RMB-JBD**

11   **MATTHEW J. PLATKIN, et al.**
     ─────────────────────────────
12   **BLAKE ELLMAN, et al.,**                       **CIVIL ACTION NUMBER:**

13   **vs.**                                         **3:22-cv-04397-PGS-JBD**

14   **MATTHEW J. PLATKIN, et al.**
     ─────────────────────────────
15

16   Clarkson S. Fisher Building & U.S. Courthouse
     402 E. State Street, Trenton, New Jersey 08608
17   Thursday, April 11, 2024
     Commencing at 4:01 p.m.

18   **B E F O R E:**            **THE HONORABLE PETER G. SHERIDAN,**
                                 **UNITED STATES DISTRICT JUDGE**
19
     **A P P E A R A N C E S:**
20

21   HARTMAN & WINNICKI, P.C.
     BY: DANIEL L. SCHMUTTER, ESQUIRE
22   74 Passaic Street
     Ridgewood, New Jersey 07450
     For the Plaintiffs ANJRPC and Ellman
23

24           John J. Kurz, Federal Official Court Reporter
                 John_Kurz@njd.uscourts.gov

25   Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.

*United States District Court*
*District of New Jersey*

2

**A P P E A R A N C E S:  (Continued)**

THE DiGUISEPPE LAW FIRM, P.C.
BY:  RAYMOND M. DiGUISEPPE, ESQUIRE (*pro hac vice*)
116 N. Howe Street, Suite A
Southport, North Carolina 28461
For the Cheeseman Plaintiffs

GELLERT, SCALI, BUSENKELL & BROWN, LLC
BY:  BRADLEY P. LEHMAN, ESQUIRE
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
For the Cheeseman Plaintiffs

OFFICE OF THE ATTORNEY GENERAL, STATE OF NEW JERSEY
BY:  ANGELA CAI, DEPUTY SOLICITOR GENERAL
     CHRISTOPHER JOHN IOANNOU, DEPUTY ATTORNEY GENERAL
Department of Law & Public Safety
R.J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
For the Defendants the Attorney General, the Superintendent of
State Police, and two county prosecutors in the Cheeseman
matter

1                              <u>INDEX</u>

2    <u>WITNESSES</u>:                                    <u>PAGE</u>

3     (None were called at this time.)

4                            <u>EXHIBITS</u>

5    <u>NUMBER</u>                                         <u>PAGE</u>

6     (None were marked at this time.)

7

8                            <u>ARGUMENT</u>

9    <u>ATTORNEY</u>                                      <u>PAGE</u>

10   By Mr. Schmutter                          10, 16, 80

11   By Ms. Cai                                14, 58, 90

12   By Mr. DiGuiseppe                         13, 37, 86

13   By Mr. Lehman                                     42

14   By Mr. Ioannou                                    43

15

16

17

18

19

20

21

22

23

24

25

1              (PROCEEDINGS held in open court before The Honorable

2    Peter G. Sheridan, United States District Judge, at 4:01 p.m.

3    as follows:)

4              THE COURTROOM DEPUTY:  All rise.

5              THE COURT:  Please be seated.

6              So how are we doing with the call, Liz?

7              THE COURTROOM DEPUTY:  Good afternoon, counsel.

8    We're about to be on the record with Judge Sheridan.  One

9    moment, please.

10             Good afternoon, counsel.  Can you hear us?

11             MR. DiGUISEPPE:  Yeah.

12             MR. LEHMAN:  Yes.

13             THE COURT:  All right.  Good afternoon.  This is --

14   there's three cases, the Association of New Jersey Rifle &

15   Pistol Clubs, Mark Cheeseman and Blake Ellman, all versus

16   Platkin and others.

17             Before we enter appearances, I just need to go

18   through a couple rules with the folks that are on the

19   telephone.

20             First of all, we won't be able to identify the person

21   speaking.  So before anyone on the telephone speaks, they

22   should state their name so we have a good transcript or

23   professional transcript of this motion.  And then sometimes

24   when people are on the phone, I don't know why, but they think

25   it's a phone conversation rather than a court appearance so

1    they talk over each other.  And I would just remind the folks

2    on the phone that it's a court appearance and you shouldn't do

3    that.  And I'll make certain that everybody that's on the

4    telephone has an opportunity to be heard on all the matters.

5    So if you just keep those rules in mind, we should proceed

6    efficiently.

7               So first thing I'll do is take appearances, and I'll

8    start with the Association of New Jersey Rifle & Pistol Clubs.

9               MR. SCHMUTTER:  Good afternoon, Your Honor.  Daniel

10   Schmutter from the firm of Hartman & Winnicki for the

11   plaintiffs in the Association of New Jersey Rifle & Pistol

12   Clubs' case and the Ellman case.

13              THE COURT:  And the Ellman case.  All right.  Thank

14   you, Mr. Schmutter.

15              So the folks on the phone, could you hear

16   Mr. Schmutter?

17              MR. DiGUISEPPE:  Your Honor, this is Ray DiGuiseppe

18   on behalf of the Cheeseman plaintiffs.  Honestly, I'm having a

19   bit of difficulty hearing Your Honor.  It sounds very distant,

20   your voice, so it's hard for me to understand.  I heard

21   Mr. Schmutter a little bit better coming through, but, yeah,

22   that's --

23              (Reporter clarified the record.)

24              THE COURT REPORTER:  I'm sorry, Your Honor.  Who was

25   speaking on the phone?

```
 1              THE COURT:  I didn't get his name either.

 2              So who was the individual that just spoke?

 3              MR. DiGUISEPPE:  I'm sorry.  This is Ray DiGuiseppe

 4   on behalf of the Cheeseman plaintiffs.

 5              THE COURT:  I'm sorry.  I can't understand your name,

 6   sir.

 7              MR. DiGUISEPPE:  Did you say you couldn't understand

 8   me?

 9              THE COURT:  Yes.

10              THE COURTROOM DEPUTY:  Is it Raymond DiGuiseppe?

11              MR. DiGUISEPPE:  Yes, that's right.

12              MR. LEHMAN:  This is Bradley Lehman, also on behalf

13   of the Cheeseman plaintiffs.  I'm hearing Mr. DiGuiseppe very

14   clearly, but Mr. Schmutter and the Court sound very far away

15   and muffled.

16              THE COURT:  Well, we're in a courtroom.

17              Liz, you have any ideas how we can do this?

18              THE COURTROOM DEPUTY:  I'm reaching out to IT to see

19   if there's a connection through your Crestron.

20              MR. DiGUISEPPE:  And, Your Honor, this is Ray

21   DiGuiseppe.  I can hear the clerk nice and clear.  It's just

22   yourself and Mr. Schmutter so far sound muffled and far

23   removed.

24              MR. SCHMUTTER:  Judge, if I can help, I -- well,

25   first of all, I think we may all want to argue at the lecturn
```

1  so that may help be closer.  I can also speak louder if that's

2  helpful, too.

3          THE COURT:  Well, I actually think it's the mics.

4          MR. SCHMUTTER:  Oh, okay.

5          THE COURT:  I'm not sure.  But then I'm worried about

6  the folks that are here may not be able to -- the people that

7  are here won't be able to hear us if we don't use the mics.

8          THE COURTROOM DEPUTY:  One moment.

9          THE COURT:  Chad, can I see you a second?

10         (Discussion was held off the record in open court.)

11         THE COURT:  We're working on the call.

12         THE COURTROOM DEPUTY:  Counsel, this is Elizabeth,

13  the courtroom deputy.  I'm going to disconnect for a moment and

14  I'm going to call back on this line.  Please don't hang up.

15  Got it?

16         MR. DiGUISEPPE:  Okay.  Got it.

17         (Pause.)

18         THE COURT:  It's not working, Liz?

19         THE COURTROOM DEPUTY:  No.  One moment.  We'll go

20  back to this.

21         THE COURT:  You know what, let me double-check

22  something.

23         (Discussion was held off the record in open court.)

24         THE COURTROOM DEPUTY:  Counsel, we're back on the

25  record on the phone in the courtroom.

```
 1              MR. DiGUISEPPE:  Okay.  This is Ray DiGuiseppe.  I'm
 2    here.
 3              THE COURTROOM DEPUTY:  Sir, are you on a speakerphone
 4    where you are or are you on a handset?
 5              MR. DiGUISEPPE:  I am on a handset.
 6              THE COURTROOM DEPUTY:  Okay.
 7              THE COURT:  Is that the best we can do?
 8              MR. LEHMAN:  This is Bradley Lehman.  I'm also here.
 9              THE COURT:  So if I stand over here, will that work?
10              All right.  We'll try this.
11              (Judge moved closer to the telephone.)
12              THE COURT:  All right.  We'll try this, kind of
13    ad hoc, but we'll do the best we can.
14              Can the folks on the phone hear me?  This is Judge
15    Sheridan.
16              MR. LEHMAN:  Yes, Your Honor.
17              MR. DiGUISEPPE:  Yes, Your Honor.  That's much
18    better.  Thank you, Your Honor.
19              THE COURT:  All right.  So I can't see everybody here
20    anymore, but we'll take appearances again.  We'll begin with
21    Mr. Schmutter, right?
22              MR. SCHMUTTER:  Thank you, Your Honor.  Daniel
23    Schmutter from the firm of Hartman & Winnicki for the
24    Association of New Jersey Rifle & Pistol Clubs plaintiffs as
25    well as the Ellman plaintiffs.
```

```
 1              THE COURT:  All right.  Thank you, Mr. Schmutter.
 2   And then for the State.
 3              MS. CAI:  Good morning -- or good afternoon, Your
 4   Honor.  Did you want to get Mr. DiGuiseppe's appearance?
 5              THE COURT:  No.  You're here.
 6              MS. CAI:  Okay.  Understood.  Good morning -- or good
 7   afternoon.  Angela Cai, Deputy Solicitor General, on behalf of
 8   the Attorney General, the Superintendent of State Police, and
 9   the two county prosecutors in the Cheeseman matter.
10              THE COURT:  All right.  Thank you.
11              And you, sir?
12              MR. IOANNOU:  Your Honor, Christopher Ioannou, Deputy
13   Associate General -- Attorney General representing the same as
14   Ms. Cai.
15              THE COURT:  All right.  Good afternoon.
16              And then on the phone, Mr., what is it, DiGuiseppe?
17              MR. DiGUISEPPE:  Yes.  DiGuiseppe, Your Honor, on
18   behalf of the Cheeseman plaintiffs.
19              THE COURT:  All right.
20              MR. LEHMAN:  Good afternoon, Your Honor.  Bradley
21   Lehman, also on behalf of the Cheeseman plaintiffs.
22              THE COURT:  Is there anyone else that wishes to enter
23   an appearance?
24              (No response.)
25              THE COURT:  All right.  So we have cross-motions, so
```

```
 1   who wishes to begin?
 2              MR. SCHMUTTER:  I'll go first, Judge.
 3              THE COURT:  All right.
 4              MR. SCHMUTTER:  If that's okay.
 5              Is that okay with everybody?
 6              (Counsel nodding.)
 7              THE COURT:  So Mr. Schmutter will begin the
 8   arguments.
 9              MR. SCHMUTTER:  Thank you, Judge.  Is it okay if I
10   step to the podium?
11              THE COURT:  You may.
12              MR. SCHMUTTER:  Thank you, Judge.
13              THE COURT:  Don't yell too loud.
14              MR. SCHMUTTER:  Okay.  I won't.
15                             ARGUMENT
16              MR. SCHMUTTER:  Your Honor, I'm not going to
17   obviously go over what's in the record.  The papers are very
18   extensive.  Your Honor doesn't need me to repeat what's in our
19   papers or in their papers.  What I'd like to do is I'd like to
20   provide context, which is extremely important.
21              THE COURT:  So start out with one issue for me, all
22   right?
23              MR. SCHMUTTER:  Yes.
24              THE COURT:  We're on cross-motions for summary
25   judgment, and it seems to me there's a lot of conflicting
```

1    facts.   So what do the parties want me to do with this case?

2         MR. SCHMUTTER:  We think -- well, we think that the

3    conflicting facts don't really -- aren't dispositive of the

4    case.

5         As Your Honor is aware, we've been arguing from the

6    very beginning, as soon as the remand came back down, that this

7    is an issue of law.  We argued to the Third Circuit that they

8    should keep it; that there was no need to make any further

9    record.  On the 2-1 decision, they sent it back down to this

10   Court.  We argued at the very beginning that there was no need

11   for discovery, there was no need for experts, and that expert

12   testimony was largely improper because it addressed issues not

13   legitimate under *Bruen* or *Heller*.

14        We still think that's largely true.  And we've put in

15   a couple of experts.  The State has put in ten experts.  But

16   our experts really just provide basic context.

17        If the Court thinks -- if the Court were to think

18   that none of the experts were credible, we still think we're

19   entitled to judgment as a matter of law based on *Heller* and

20   *Bruen*.  So we think that Your Honor can grant summary judgment

21   one way or the other.  We don't -- we don't see a need for

22   trial, you know.  We certainly don't see a need to bring in

23   experts to testify.  That's our sense of this.  Obviously, the

24   State wanted discovery, and of course the Court allowed very

25   extensive discovery, and we're here today.  But I hope that's

1    the answer to your question.

2              THE COURT:  Well, I don't think it answers

3    everything.

4              So, Mr. DiGuiseppe and Mr. Lehman, do you agree with

5    that?

6              MR. DiGUISEPPE:  Your Honor, this is Ray DiGuiseppe.

7    I have to admit, I can hear you, which is more important, but

8    I'm not able to hear those who are speaking to you from where

9    they are.  So I really couldn't hear anything with any clarity

10   that Mr. Schmutter just said.

11             THE COURT:  Oh, my gosh.  Well, I don't know how we

12   can help you out, Mr. DiGuiseppe.  We've moved the phone

13   around.  We're standing very close to you.

14             MR. DiGUISEPPE:  Yeah.  Understood.  I don't know

15   either.  And in the prior telephonic conferences we've had,

16   there hasn't been an issue like this, so that -- I don't know

17   what the issue would be.  But that's what I can say.

18             If, you know, we can try to still handle it in terms

19   of just addressing your questions, depending on what another

20   party has said.

21             THE COURT:  Okay.  I don't know.  Yeah.

22             MR. DiGUISEPPE:  You know, if that's sufficient.

23   It's somewhat of an issue when it comes to not being able to

24   hear the defense's arguments, I assume, I would say more than

25   the co-plaintiff.  But in any event, we can try to proceed as

```
 1    best we can.
 2              THE COURT:  Mr. Schmutter, can you just move up to
 3    the phone here and maybe he can hear you.
 4              MR. SCHMUTTER:  Yes, Judge.  We'll see if that works.
 5              See if we can do this.
 6              Ray, can you hear me now?
 7              MR. DiGUISEPPE:  I can hear you now, yes.
 8              MR. SCHMUTTER:  Oh, okay.  I can even bring this up
 9    closer.
10              THE COURT:  We have this huge courtroom so we can all
11    stand in a post stamp.
12              (Laughter.)
13              MR. SCHMUTTER:  We could have done this at Chili's;
14    we didn't have to be in the courtroom.
15              THE COURT:  So, Mr. DiGuiseppe, do you know the
16    question?
17              MR. DiGUISEPPE:  I think your question, Your Honor,
18    was that you saw a number of competing facts and what do the
19    parties want to do with the case in light of that?
20              THE COURT:  Yes.
21              MR. DiGUISEPPE:  Okay.  From our perspective, Your
22    Honor, there aren't facts in dispute that would preclude
23    summary judgment in our favor for reasons outlined in the
24    briefing, most specifically that we -- and also, too, just to
25    clarify, in our case we have a more narrow scope of the claims
```

1    where we're just targeting the restrictions or the ban on the
2    assault firearms, right?  We're not getting into the
3    large-capacity magazines or the self-manufacturing
4    restrictions.  So from that perspective, especially I think
5    when we're focusing on the common-use test and what that
6    demonstrates, its being a very simple analysis, that takes us
7    to a conclusion that these types of bans can't be upheld
8    against these types of weapons when they're commonly used for
9    lawful purposes, which we think is a fact that's quite clear
10   and not subject to any reasonable dispute in the record.
11             THE COURT:  All right.  Thank you.  How about the
12   State?
13             MS. CAI:  Your Honor, on this preliminary issue, just
14   as a matter of context, Mr. Ioannou and I will be splitting the
15   actual argument, but on Your Honor's specific question, we
16   think that the Court can grant the State summary judgment based
17   purely on admitted undisputed facts and a couple of facts that
18   are not in genuine dispute, despite the statement "disputed" in
19   their counterstatement, and we can lay them out in greater
20   detail in our argument.
21             However, we do think that if you disagree with what I
22   just said, Your Honor can't grant the plaintiff summary
23   judgment because we have genuine issues of material fact on
24   their facts.
25             So it is always a little bit complex with

1    cross-motions, but we were hoping to go through some of those

2    undisputed facts with you in our argument today.

3              THE COURT:  All right.  Thank you.

4              THE COURTROOM DEPUTY:  I apologize.  I want to make

5    sure that the person on the phone can hear.

6              THE COURT:  Oh.  So, Mr. DiGuiseppe and Mr. Lehman,

7    could you hear the State's attorneys?

8              MR. DiGUISEPPE:  To be honest, Your Honor, this is

9    Ray DiGuiseppe, not really.  But I could catch a few words here

10   and there, not very clearly, though, honestly.

11             THE COURT:  You're going to have to -- you're going

12   to have to move up.

13             MS. CAI:  Sure, Your Honor.  I'm happy to do that.  I

14   was going to suggest, and I don't know if it will work, is it

15   worth trying to have another microphone that's mobile so that

16   we can move it around?  I may create feedback, so it may not

17   work.

18             THE COURT:  I don't think that will work.

19             MS. CAI:  All right.  I'll just repeat.

20             The State's position is that the Court can grant

21   summary judgment to the State on the basis of admittedly

22   undisputed facts and facts that are not in genuine dispute that

23   are material.  However, the State believes that if the Court

24   does not agree with that, it cannot grant summary judgment to

25   the plaintiffs because the State has disputes of material fact

```
 1   with the plaintiffs' statements of material fact that they

 2   would need to rely on.  So that's sort of our position in this

 3   case, and that's not uncommon in cross-motions for summary

 4   judgment.

 5           Thank you.

 6           THE COURT:  All right.  Thank you.

 7           So you heard that, Mr. DiGuiseppe and Mr. Lehman?

 8           MR. DiGUISEPPE:  Yes, Your Honor.  I did hear that.

 9   This is Ray DiGuiseppe, yes.

10           THE COURT:  All right.  So thank you.

11           Mr. Schmutter.

12           MR. SCHMUTTER:  Thank you, Judge.

13           So as I was saying, I'm just willing to provide

14   context for how the Court should examine the record.

15           As the Court is aware, this case is one of quite a

16   few cases just like it.  New Jersey is not the only state that

17   has these laws.  And we're not the only plaintiffs challenging

18   these laws.  These cases are all over the country, Illinois, in

19   Maryland, they're in Delaware, they're in California, Oregon.

20   And there are some themes that have come up and have come up in

21   each of these cases, and they've come up in this case.  And

22   some of the courts are getting it right; some of the courts are

23   getting it wrong.  And I think it's for the same reasons.  And

24   it's the context of how to understand *Bruen* and *Heller* that

25   makes all the difference here and why some courts are getting
```

1    it right and why some courts are getting it wrong.

2           *Bruen* -- and some of this came up, Your Honor, in the

3    argument on the *Daubert* and expert motions, but it bears

4    repeating here even more extensively.

5           *Bruen* did three important things.  Obviously *Bruen*

6    was about, nominally on its factual record, it was about the

7    right to carry handguns outside the home, but *Bruen* was also

8    about something else.  *Bruen* was about 12 years of most lower

9    courts getting this stuff wrong.

10          After *McDonald* in 2010, that kind of opened the doors

11   for lots and lots of litigation against state law, and most

12   laws that were challenged were upheld.  And what we know, now

13   that we've all read *Bruen*, is that most of the courts were

14   doing interest-balancing, which was not allowed in *Heller*.

15   Interest-balancing was Justice Breyer's dissenting opinion, and

16   the Court was absolutely clear that that was not allowed, but

17   most courts were doing it, and most courts were upholding the

18   laws, just like these laws as well, the laws of these cases

19   pre-*Bruen* in addition to the laws of these cases post-*Bruen*.

20          And so in addition to just dealing with the specific

21   issue of right to carry, *Bruen* also dealt with how does the

22   Supreme Court make it so that the lower courts are following

23   *Heller* and are dealing with the Second Amendment correctly.

24          Well, the first thing they did was the Court

25   clarified and gave greater specificity to what the rule

1    actually is.  Because, as we know, and some courts again have

2    gotten this wrong, *Bruen* didn't create a new rule.  *Bruen*

3    applied -- and they say it in the opinion -- they applied the

4    principles of *Heller*, but what *Bruen* fashioned was specific

5    steps to take in order to do *Heller* correctly.  And that's

6    where we get *Bruen*'s, you know, two steps.  Even though they

7    say it's only one step, we all know it's really two steps.

8         And the third thing the Court did was to push back on

9    12 years of erroneous rulings by courts all over the country.

10   And you can hear it when you read *Bruen* repeatedly, you can

11   hear it in the language of *Bruen*.  And, in fact, you can even

12   hear it when you read Justice Thomas' dissenting opinions in

13   cases like *Rogers*, which was a case here in New Jersey, *Peruta*,

14   Ninth Circuit case, *Friedman*, Seventh Circuit case, where

15   Justice Thomas was repeatedly saying, hey, we got to get back

16   to the Second Amendment, we've got to get things back on track,

17   things are going off the rails.

18        Finally, with the appointment of Justice Barrett,

19   there was a sufficient majority to do that.  So *Bruen* is a

20   pushback on the lower courts, reminding the lower courts to

21   take the Second Amendment seriously.

22        And since we know that the Second Amendment is as

23   significant as the First Amendment, the Second Amendment right

24   that's protected is as important as the First Amendment, it's

25   not a second-tier right, what *Bruen* teaches us and what *Heller*

1   taught us is that it should be difficult to regulate the right

2   to keep and bear arms.  Just like it's difficult to regulate

3   speech, just like it's difficult to regulate the free exercise

4   of religion, it should be difficult to regulate the right to

5   keep and bear arms.  And the 12 years between *McDonald* and

6   *Bruen* was the opposite of that.  States were getting away with

7   pretty much everything.

8            So *Bruen* is that kind of pushback.  It is, look,

9   you're doing it wrong, you've got to take this seriously, we

10  really meant what we said in *Heller*.

11           Okay.  Why is that context important other than just

12  on its face?  It's important because the 12 years that states

13  were getting away with interest-balancing in the courts was

14  taken away from them in *Bruen*.  So what did the states like New

15  Jersey in this case and other cases in this Court, what have

16  they done?  They have desperately sought some other way of

17  doing interest-balancing and bringing it back in through the

18  Second Amendment because it was taken away from them.

19           So what have they done?  They have keyed in on

20  certain language in *Bruen*, "unprecedented societal concern,

21  significant change in technology," and they've said, aha, we're

22  going to use that to truck back in through a giant hole

23  interest-balancing.

24           And so we have ten -- well, we have nine affirmative

25  experts from the State basically doing that, and it is just as

1   improper post-*Bruen* as it was pre-*Bruen*.  And I'll get to more

2   on the unprecedented societal concern and significant change in

3   technology in a minute or in a couple minutes.  That's what's

4   happening here.

5        So we're going to ask the Court to think about *Bruen*

6   in the following manner:  If you put yourself -- if Your Honor

7   puts yourself in the shoes of the *Bruen* majority, a Justice

8   Thomas, a Justice Alito, a Justice Kavanaugh, any of them,

9   right, if what *Bruen* was about was pushing back on 12 years of

10  getting it wrong by the courts all over the country, if the

11  goal was to push back on that to say, no, you can't do

12  interest-balancing, it should be difficult to regulate the

13  right to keep and bear arms and to limit the right to keep and

14  bear arms, what is the chance that they put language in *Bruen*

15  that would blow a giant hole in the Second Amendment?  Zero.

16       And so what the states like New Jersey and states all

17  over the country are doing is they're taking a position that

18  there's somehow this great avenue that they can basically get

19  all their interest-balancing back in, all they need is all

20  these experts like Webster, the doctor, Yurgealitis.  All these

21  experts are basically there to talk about how horrible these

22  arms are and to paint the same kind of record that they wanted

23  to paint before.  They used Lucy Allen in this case, and they

24  used Lucy Allen in the case we went before Your Honor in 2018.

25  They're trying to do the same thing.

1    Our view is that there is no way that that's what the
2    Supreme Court intended.  There's no way that they would go out
3    of their way after 12 years and write *Bruen* but say, you know
4    what, bring in all your experts, bring in all -- make these
5    records of mass shootings, make all this record because we
6    didn't really mean it when we said no interest-balancing twice.
7    The Supreme Court would be and will be appalled at
8    what these states are doing.  It's not just New Jersey.  It's
9    all the other states, Illinois, California, Maryland, they're
10   all doing the same thing.
11   The Supreme Court, when they see this, their view is
12   going to be that's not what we intended.  This was not an
13   invitation for states to just truck it all back in again.
14   That's an important aspect of what's happening here that we're
15   asking the Court to keep in mind very seriously when looking at
16   this record.
17   I'd like to talk about --
18   THE COURT:  But they didn't say states couldn't
19   regulate --
20   MR. SCHMUTTER:  They didn't say states couldn't
21   regulate.  But what they didn't make clear is that it should be
22   difficult to regulate.  And the approach that the states are
23   taking would allow them to do almost anything.  And I'll get to
24   that in more detail when I deal with -- when I talk about
25   unprecedented societal concern and significant change in

1    technology, because that's the new interest-balancing.

2            I'd like to talk about common use, though, because

3    it's critically important.  As in this case and as in all of

4    the cases around the country, how common use works and whether

5    it's actually the rule is undisputed in all these cases.  So I

6    want to talk about common use historically and what it is and

7    where it came from because that's critically important.

8    Because the states like New Jersey and these other states are

9    misconstruing what common use -- what the test actually is and

10   how it works.

11           The common-use test -- and I hate the word "common

12   use," but that's what people call it and so we're stuck with

13   the word "common use," because it invites this confusion over

14   the word "use."

15           The test out of *Heller* and out of *U.S. v. Miller* is

16   typically possessed -- it doesn't say "use," possessed --

17   typically possessed by law-abiding individuals for lawful

18   purposes.  That's the phraseology of the actual common-use

19   test.  That's the language in *Heller*.  That's the language in

20   *U.S. v. Miller.*

21           Notable in that phraseology is there's no word -- the

22   word "use" doesn't appear there.  And the word "self-defense"

23   doesn't appear there.  And yet New Jersey and the other states

24   are saying two different -- two things.  Number one, it has to

25   be in common use for self-defense, and what that means is

1   pulling the trigger and shooting a bad guy.  And so New Jersey

2   and other states are insisting that it is the plaintiffs'

3   obligation to actually show numerosity for the number of actual

4   self-defense shootings of bad guys.

5          Well, that can't be.  First of all, that's not how

6   it's described in *Heller*.  And that couldn't possibly be how

7   the common-use test works because firearms are very -- people

8   very rarely use their firearms.

9          Most people, just like they never use the seat belts

10  in their cars.  They use it, they use it by putting it on, but

11  they don't actually get involved in an accident where they need

12  their seat belts.  Similarly, most people who own firearms

13  don't ever shoot a bad guy.

14         And so the idea that common use means the Court is

15  required to count up the number of times the gun owners

16  squeezed the trigger against a bad guy, that's absurd.  So

17  there are two possible ways to think about it.  We can

18  disregard the word "use" and really focus on possession,

19  because that's really what *Heller* says, or -- and I've heard it

20  phrased this way as well -- "use" includes possession.

21         So common use means buying it, possessing it, going

22  to the range, practicing, acquiring ammunition, that's the

23  broad sense of "use."  It doesn't matter.  Either one of those

24  encompasses what's actually going on.  But that's important

25  because New Jersey is trying to box in the plaintiffs by

1    saying, oh, well, you have to make a record and show that

2    there's actual uses for self-defense.  Again --

3              THE COURT:  Did Thomas say that in *Bruen*?

4              MR. SCHMUTTER:  I'm sorry?

5              THE COURT:  Did Thomas say that in *Bruen*?

6              MR. SCHMUTTER:  Well, they don't -- in *Bruen*, the

7    common-use test -- the common-use concept does come up in *Bruen*

8    when they're talking about when they're analyzing history, but

9    because *Bruen* is not a --

10             THE COURT:  But it was dealing with -- it was dealing

11   with possessing a firearm in public, right?

12             MR. SCHMUTTER:  Right.  *Bruen* is really about -- the

13   record in *Bruen* is about conduct, not about arms bans.  So the

14   common-use test is appropriate for arms bans like what we have

15   here.  *Bruen* is a conduct case, which is why the two-step

16   rubric that *Bruen* lays out is not appropriate in this case.

17             As I said before, the common-use test actually comes

18   from *U.S. vs. Miller.*  There's not much to commend *Miller*.  It

19   was a terrible case because, first of all, it was one-sided.

20   Only the government was there.  *Miller* didn't put in a brief,

21   and it's a very mild, very thin decision.  But the one thing

22   that the Supreme Court in *Heller* pulls out of *Miller* is what is

23   the common-use test.

24             And the reason -- the way the Court gets to this

25   concept of what the common-use test is, is looking at the

1   language in *Miller* that talks about the history of militias in

2   the United States.  What did a militia -- how did a militia

3   work in the United States?  A militia was ordinary people that

4   would show up and muster with whatever arms they had in their

5   house.

6           The way *Miller* describes it -- and this is what

7   *Heller* keys in on -- they would come to muster showing up with

8   whatever was in common use at the time.  It's what they had.

9   They, the people decided which arms they would keep and which

10  arms they would show up with.  Nobody told them what to bring.

11  The common -- the concept of common use is what people choose

12  to possess.  And that's the linchpin of the common-use concept.

13  And that's the linchpin of how *Heller* comes out the way it

14  does.

15          The Second Amendment and the common-use test is about

16  the idea that it is the people's choice.  It is up to the

17  people to decide what arms are appropriate for whatever lawful

18  uses they wish to put them to, including self-defense.  That's

19  critical, because what that means is it's not the State's

20  decision what arms are appropriate or what arms are not

21  appropriate.  And so when you have testimony like Yurgealitis

22  who says, well, I don't think these arms are particularly

23  appropriate for self-defense, I would choose a revolver, that's

24  fine for Yurgealitis, but that's not how the common-use concept

25  works, and that's not how the Second Amendment works.  It's for

```
 1    the people to decide.  That's why commonality is so important,
 2    because the commonality of an arm tells us what people have
 3    chosen, and that's why Heller comes out the way it does.
 4            What the Court in Heller says is that handguns are
 5    the most widely chosen arm for self-defense.  That's why
 6    possession of handguns was constitutionally protected because
 7    it was the people's decision and their choice to choose
 8    handguns.  All of that is the genesis of the common-use
 9    concept.
10            So when you look at numerosity, when you look at,
11    okay, how common is a magazine in excess of 10 rounds, how
12    common is a rifle that falls within the statutory definition
13    that has the features, the quote-unquote evil features, the
14    fact that people have chosen them and owned them, that's the
15    end of the story.  That is what matters.
16            And so for the State to present a witness that says I
17    don't think that that's appropriate for self-defense or some
18    other lawful purpose -- he doesn't even go to other lawful
19    purposes, he says self-defense, but it's all for lawful
20    purposes -- that's not relevant.  It's what the people choose.
21    And that's why the entire record on what criminals do is not
22    constitutionally relevant.  Criminals do terrible things.  We
23    know that.  But the constitutional question focuses on the
24    law-abiding people and what they choose to do, not what the
25    criminals do.
```

1              That's exactly why interest-balancing is not allowed,

2   because all you would end up with is a battle of what good guys

3   do, what bad guys do.  And what the Court says in *Heller* is

4   that the Second Amendment represents that balancing already.

5   The Second Amendment -- the existence of the Second Amendment

6   is the idea that law-abiding people get to have arms and they

7   get to use them for lawful purposes and they get to choose

8   which ones they want.  And you don't get to say, but we think

9   that the availability of arms is bad because bad people do

10  things with them and they shoot people and kill people.  That's

11  not constitutionally relevant.

12             And just like with the First Amendment, just like

13  with the Fourth Amendment where you can't just bust into

14  someone's house and find evidence that you like, just like with

15  the Fifth Amendment where you can't coerce a confession -- how

16  great would it be for law enforcement if they could do

17  warrantless searches and coerce confessions and deny people the

18  right to counsel -- all of those things make it hard for the

19  State to fight crime, but the State has to use other means to

20  fight crime -- the Second Amendment is exactly the same way.

21  Some things are off the table.  And that's what *Heller* and

22  *McDonald* and *Bruen* tell us.

23             There is a -- there is a -- oh, and this is how we

24  know that the common-use test is the only test for arms bans,

25  equipment bans, okay.  You don't do the historical inquiry

1    again.  *Heller* already did the text and history analysis for

2    arms bans.  So the two-step process in *Bruen* is for things

3    other than arms bans, like the right to carry, like

4    conduct-based regulations.  But there is no place to redo that.

5    So the State has attempted to make a record about historical

6    analogs.  There's no historical analogs that are relevant

7    because it was already done in *Heller*.  How do we know that?

8    Well, *Heller* tells us that.  But let me read an excerpt from

9    *Bruen* where even in *Bruen* they make that clear.

10           So on page 47 -- and I'm using the U.S. Reports

11   citations.  I know we all were doing the Supreme Court reports

12   because the U.S. Report takes forever to come out, but now that

13   there's a U.S. Report citation for *Bruen*, I'm going to go use

14   those pages.  So on page 47 there is a discussion of affray,

15   the history of affray statutes.  And in addition to, you know,

16   the old English affray statutes, there also were affray analogs

17   in colonial America.  And --

18           THE COURT:  By the way, you know, I have a lot of

19   people.  You have like another ten minutes.

20           MR. SCHMUTTER:  Okay.  Yeah.  I'll be quick.

21           In addition to the -- in the discussion why the

22   affray statutes don't defeat the claims in *Bruen*, the Court

23   says this:  Regardless, even if respondents reading these

24   colonial statutes were correct, it would still do little to

25   support restrictions on the public carry of handguns today.  At

1    most, respondents can show that the colonial legislatures

2    sometimes prohibited the carry of dangerous and unusual

3    weapons, a fact we already acknowledge in *Heller*.  Drawing from

4    this historical tradition, we explained -- in *Heller* they're

5    talking about -- there that the Second Amendment protects only

6    the carrying of weapons that are those in common use at the

7    time as opposed to those that are highly unusual in society at

8    large.

9            Here's the key:  Whatever the likelihood that

10   handguns were considered dangerous and unusual during the

11   colonial period, they are indisputably in common use for

12   self-defense today.  They are, in fact, the quintessential

13   self-defense weapon.

14           Thus, even if these colonial laws prohibited the

15   carrying of handguns because they were considered dangerous or

16   unusual weapons in the 1690s, they provide no justification for

17   laws restricting the public carry of weapons that are

18   unquestionably in common use today.  That segment in *Bruen*

19   tells us we don't look at analogs for restrictions at the time

20   of the Founding.  That question is done.  The common-use test

21   is it.  We don't redo an examination of arms restrictions back

22   from the 17th and 18th Centuries.  That has --

23           THE COURT:  That only applied to handguns.

24           MR. SCHMUTTER:  I'm sorry?

25           THE COURT:  That only applied to handguns.

1        MR. SCHMUTTER:  Yes.  But they --

2        THE COURT:  So how about all different weapons, other

3   weapons?

4        MR. SCHMUTTER:  But they're not saying that there was

5   anything special about handguns.  They were talking about the

6   commonality.  What they said is the commonality trumps whatever

7   the regulations were back then.  Even if handguns were

8   considered dangerous and unusual back then, it's the

9   commonality today that matters, and that's the only thing that

10  matters.

11        So according to both *Heller* and *Bruen*, you don't go

12  back to look at old state analogs to see how they banned Bowie

13  knives or trap guns or whatever the State is trying to argue.

14        The Court in *Bruen* makes it clear that that stuff is

15  no longer relevant.  You don't go do step two of *Bruen* over

16  again.  You don't go back into history.  Arms bans are governed

17  by the common-use test and only the common-use test, and that

18  is what that passage in *Bruen* says.

19        Let me just quickly talk about -- oh, circularity.

20  There's a very important circularity argument that New Jersey

21  makes and other states make.  They say, well, numerosity can't

22  be the entire -- can't be the rule because what if the State --

23  that's only because the State didn't ban them at the time.

24  Well, what if a new arm comes out and the State bans it

25  immediately?  Doesn't that make it circular?  It doesn't.

1          Because the Second Amendment is about choice, when

2     the opportunity for people to manifest their choice is

3     available, that is, if the State doesn't ban an arm, then

4     people can manifest their choice by purchasing and acquiring

5     the arms.  And so in that case, numerosity demonstrates

6     commonality.

7          In the hypothetical example, because I'm not sure if

8     there's ever been an example of where the State immediately

9     bans something even before people have a chance to buy it, in

10     that hypothetical example, that doesn't make it circular.  That

11     just means the courts need to come up with a different way of

12     determining what people's choices would be.  That's not

13     applicable here because here we have numerosity.

14          And since we -- since the concept of numerosity is a

15     reflection of people's choices and because the Second Amendment

16     protects people's choices of weapons, commonality has to be the

17     rule.

18          Okay.  Let me talk quickly about unprecedented

19     societal concerns, significant change in technology.  As I said

20     before, there is no way that that was intended for the Court to

21     reintroduce interest-balancing when one of the key points of

22     *Bruen* was to get rid of interest-balancing.

23          Importantly, all of the -- the entire record that the

24     State has tried to make would apply to *Heller* and would apply

25     to *Bruen*.  They focus heavily on semiautomatic technology.

1    Well, most handguns today are semiautomatic anyway.  So if

2    semiautomatic Glock handguns or semiautomatic SIG or Smith and

3    Wesson handguns didn't present unprecedented societal

4    concerns -- because the record is undisputed that handguns are

5    responsible for vastly more murder than the banned arms here --

6    if that wasn't an unprecedented societal concern, if that

7    wasn't a significant change in technology justifying a

8    departure from the common-use rule, then nothing that the

9    experts, the State's experts have said could possibly do that.

10           Yes, mass shootings are terrible, but in terms of

11   their frequency, they're vastly less frequent than ordinary

12   street shootings with handguns.  So if handguns can't be banned

13   for all those reasons, they can't use that same reasoning, they

14   can't key in on that language and say, aha, let's bring in all

15   our experts to show how terrible these rifles are.  Can't

16   possibly be.

17           And I'll just make one reference to the declaration

18   of Ashley Hlebinsky, our historian.  The best part about that

19   testimony is how she goes through hundreds of years of history

20   of firearms technology.  And what she shows is how -- two

21   things -- military and civilian technology crossed over in both

22   directions for hundreds of years.  There was never any

23   significant distinction between military and civilian

24   technology.  And, in fact, military has often took civilian

25   firearms technology and imported that for their purposes.

1          The other thing she shows, and this is undisputed, is

2     that there has been for hundreds of years gradual change over

3     time, including during the Founding Era.  All of the

4     technological change at the margin was to shoot faster,

5     straighter and farther and more accurately.  And all of those

6     things and all of the technology that has been developed over

7     the years is just as useful for a defender as a murderer.  And

8     that's one of the unfortunate things about, you know, the

9     firearms, is they can -- the things that make them useful for

10    murderers also makes them great for self-defense as well.  And

11    that's why *Heller* and *McDonald* and *Bruen* tell us to focus on

12    the law abiding and not the -- and not the criminal.

13         And so if the State's theory about how unprecedented

14    societal concern and significant change in technology were

15    true, *Heller* and *Bruen* would come out the other way because of

16    the nature of those cases.  Those cases are a greater argument

17    for their theory.  And since those cases didn't -- they came

18    out in favor of the right to keep and bear arms, they can't

19    possibly be right about how that terminology works.

20         I'm actually going to sit down, Judge.  I know you're

21    pressed for time.

22         THE COURT:  If you have another point, go for it.

23         MR. SCHMUTTER:  Okay.  There is -- I'll make a note,

24    it's very interesting, if you look at the statutes and if you

25    look at the expert testimony that the State has tried to put

1    in, none of the testimony has anything to do with what the

2    statutory features are.  They all complain about the 5.56

3    cartridge.  The statute says nothing about the 5.56 cartridge.

4    The ban has nothing to do with 5.56.  5.56 is completely legal,

5    and there are lots of firearms that use the 5.56 cartridge that

6    are not banned.

7            They complain about semiautomatic action, but there

8    are lots of completely legal arms under these statutes that are

9    semiautomatic.  What the statute focuses on are things that

10   have nothing to do with the record they made and have nothing

11   to do with mass shootings.  Flash suppressors, they don't say

12   anything about flash suppressors.  Adjustable stocks, nothing

13   in the record about how adjustable stocks contribute to mass

14   shootings.  Bayonet mounts, nobody's bayoneting people in

15   malls.

16           Their record doesn't match the statute in any way.

17   And yet that's the rubric that this regulation supposedly goes

18   under.

19           They just don't like firearms that are effective.

20   That's really what it comes down to.  They don't like firearms

21   that are effective.  And yet law-abiding people can use

22   firearms that are effective to do all the things that

23   law-abiding people might reasonably want to do with firearms.

24   Whether it's self-defense, whether it's hunting, target

25   shooting, collecting, all of the features that are at issue

1    with these arms and that their experts complain about are all

2    chosen by people on purpose.  We know that they're useful for

3    self-defense and lawful purposes because people have said they

4    are, because they buy them.  They're not buying them to put on

5    their shelf.  They're buying them for the reasons -- for the

6    lawful purposes that they wish to put them to.

7              And, Judge, with that, I'll just -- I'll sit down.

8              THE COURT:  All right.  Thank you.

9              MR. SCHMUTTER:  Unless Your Honor has any questions.

10   Thank you.

11             THE COURT:  No.  I have just a comment,

12   Mr. Schmutter, and it's really not on your argument.

13             MR. SCHMUTTER:  Yes.

14             THE COURT:  But the problem that we have in the

15   country is that we can't figure out how to stop mass shootings.

16   And it seems to me that the parties that are involved in this

17   suit, as with all the other suits, are not combining their

18   intellectual capacities in a way to resolve the problem.  And I

19   think they probably have the ability to at least somehow lessen

20   the frequency of those events.

21             MR. SCHMUTTER:  I have a comment for Your Honor, but

22   it's not in the record.  Is it okay if I talk about it?

23             THE COURT:  You may.

24             MR. SCHMUTTER:  Okay.  The way you reduce mass

25   shootings is by stop creating so-called gun-free zones.

1    94 percent of mass shootings take place where guns are not

2    allowed.  If ordinary citizens could carry guns in places that

3    are vulnerable, you'd see much fewer mass shootings.  There's a

4    reason why people pick these so-called gun-free zones to do

5    their mass shootings.  And, you know, there's a great study,

6    again, it's not in my paper, not in my brief, but I'm happy to

7    provide the Court and counsel with the citation, there's a

8    great study from years ago by John Lott.  It's called

9    "Multiple-Victim Shootings."  And he demonstrated that states

10   with liberal concealed-carry laws -- and, of course, now

11   post-*Bruen* everybody has concealed carry, but in the days

12   before *Bruen* -- and only some states allowed concealed carry --

13   states with concealed-carry laws had a reduction in both the

14   frequency and the severity of multiple-victim shootings.

15         Why?  Because if someone wants to go into a mall or a

16   school or wherever and shoot a lot of people, they're going to

17   go to a place where there's much less likely to be someone

18   who's going to shoot back.  And we know that from Aurora,

19   Colorado, Adam Lanza [sic].  He specifically chose the Cinemark

20   theater that was farther away from him because he knew that

21   they didn't allow guns.  He skipped over closer theaters where

22   they did allow guns.  But I know that's not in the record,

23   Judge.  I hope that's helpful.  But that's my answer to your

24   question, Your Honor.

25         THE COURT:  All right.  So does the State want to go

1    next or do you want to hear from all the plaintiffs?

2            MS. CAI:  Your Honor, I think it probably makes more

3    sense to hear from all counsel on the plaintiffs' side first.

4            THE COURT:  All right.  So, Mr. DiGuiseppe, do you

5    wish to be heard?

6            MR. DiGUISEPPE:  Yes, Your Honor.  And I'll try to

7    keep it brief for everyone's benefit, and I think mainly

8    because I can adopt also what Mr. Schmutter has said.  I think

9    it was well-articulated, and I would agree with all of his

10   well-articulated points.  I would just add a few things.

11           I think, first off, I think Mr. Schmutter is doing

12   the right thing in trying to explain that the test is intended

13   to be more difficult or difficult in the sense of making courts

14   have to work or making states have to work and courts also have

15   to work if these types of regulations are to be upheld.  But I

16   think we only need to be concerned with difficult in the sense

17   of abiding by and adhering to the test, because the word

18   "difficult" can be somewhat subjective.

19           The test is the test, and the test is what it is.

20   And I think it's clear what the test requires, as Mr. Schmutter

21   pointed out.  Importantly, when we talk about common use, for

22   example, it would be entirely absurd to follow the Attorney

23   General's claim about what common use actually means, because

24   if that were true, then anything could be essentially outlawed

25   or banned, including the handguns that were at issue in *Heller*,

1    because you're not going to be able to show, fortunately, that

2    there is a tremendous commonality or numerosity in the events

3    of actually shooting people in self-defense.  And *Heller* and

4    *Bruen* were quite clear.  In *Heller*, the Court pointed out that

5    the word "bear" means to be armed and ready for offense or

6    defensive action, be ready for it, prepare, I guess, in case of

7    confrontation.  *Bruen* says the same thing; that the Second

8    Amendment protects the right to possess and carry in case of

9    confrontation.  Simple as that.

10             And I think we have the further complication with

11   common use here because the State then tries to tie that in

12   with the textual prong and make this argument that the

13   common-use issue is a textual issue and therefore the

14   plaintiffs have to bear that burden of showing what common use

15   is.  Apart from the distortion of what common use means, that's

16   not part of the textual analysis.  It's very clear it's part of

17   the historical discussion.  And the Court was clear on that

18   with explaining that basically when it got into the issue of

19   common use, it was discussing a limitation on the right insofar

20   as there's only been a historical tradition of banning or

21   outlawing arms that are not in common use because they're

22   dangerous and unusual.  That's the context in which it came up.

23   That's the only way it makes sense, and that's the only way to

24   interpret *Bruen* and *Heller*.

25             When we get to the lethality issue and the concerns

1    over violence and criminality, I think Mr. Schmutter is exactly

2    right.  I would just highlight that the Supreme Court in both

3    *Bruen* and *Heller*, they already considered that propensity for

4    violence or possibility of misuse, criminal use.  And the

5    dissent in those cases spent almost the entire time talking

6    about those concerns, which are valid concerns, but they

7    obviously can't and they don't control.

8             When we get to the issue of danger, dangerous and

9    unusual, I think also what Mr. Schmutter said, I would echo

10   that, and that it's a conjunctive test.  It's not disjunctive

11   as the State tries to characterize it.

12            What we're talking about here, too, are, at least

13   when we talk about the "assault firearms" aspect of it, are

14   devices and features on a firearm that make it more accurate

15   and more precise.  So it's quite perverse to put a ban on those

16   arms when they're intended to provide the user with greater

17   accuracy and precision and therefore reduce the likelihood of

18   collateral damages or accidental shootings.

19            It's quite perverse to try to put a label of

20   dangerous and unusual, and they're actually not even doing

21   that, right?  Because they're trying to split it up and say

22   it's disjunctive; that it only has to be dangerously unusual or

23   unusually dangerous so it merges together in one unified term.

24   But they are distinct.  It's got to be something that's

25   dangerous in a way over and above the actual -- the normal

1    propensity of a firearm.

2              And to the extent that these firearms are supposedly

3    of concern because of their various features, again, those

4    features are modern advancements in technology to enhance the

5    ability to be precise and accurate in shooting.  And it's

6    ironic and perverse to claim that those are subject to a ban

7    when back in 2008 when the Supreme Court was looking at

8    handguns that were on the market at that time, technology was

9    not nearly as advanced as it is now, and those couldn't be

10   subject to such a ban.

11             When it comes to mass shootings and the Court's

12   concern there, I think the trouble with trying to tie this to

13   the mass shooting problem, and nobody's denying that it's a

14   problem, but in this context and when we have to consider it

15   under *Heller* and *Bruen*, we're talking about semiautomatics.

16   We're not talking about automatic firearms in order to try to

17   use this case or other assault weapon ban cases that target

18   semiautomatics as a vehicle to address the mass shooting

19   problem, it's not going to work, because semiautomatics, the

20   handguns at issue in *Heller* were mostly semiautomatic arms.

21   There's no question that semiautomatic arms are of the sort

22   that are fully protected under the Second Amendment.  And

23   there's no historical precedent for broadly banning

24   semiautomatic firearms; there just isn't, much less is there

25   one for banning firearms that are of a modern, advanced,

1    technologically precise, more accurate nature than their

2    predecessors.  There's nothing out there that would support

3    such a ban.

4            So from our perspective, and, again, I would echo

5    most of what Mr. Schmutter said, for those same reasons, we

6    think the outcome here is clear in terms of summary judgment

7    for the plaintiff.

8            I think when we heard the Attorney General at the

9    beginning of the argument say something to the effect that

10   summary judgment should be granted for the State because the

11   State's position is that the facts that matter are not in

12   dispute in their favor and not the other way around, I think

13   what that must mean is that they're saying the facts that are

14   not in dispute which are necessary to support their argument is

15   that we can't show that these are a common use for actual

16   self-defense.  And that is clearly not the test.

17           So to the extent that that's the basis of the

18   argument, it falls apart, because there's no way that common

19   use could, A, be part of the textual analysis.  B, whatever it

20   is in the analysis, that it can be common use for purposes of

21   actual firing in self-defense, it's an unacceptable

22   interpretation of the law.

23           So that's what we would have to add.

24           THE COURT:  All right.  Thank you.

25           How about Mr. Lehman?

1          MR. LEHMAN:  Your Honor, I have nothing else

2     argument-wise.  But with your permission, I would address your

3     comment very briefly.

4          THE COURT:  You may.

5          I didn't mean to spark -- I didn't mean to spark a

6     debate on that, but you may.

7          MR. LEHMAN:  I think that we would all be served if

8     the state legislatures and the Congress were to dedicate their

9     resources to addressing perhaps more difficult problems like

10    mental health.  Because when we look at these mass shooting

11    events generally across the board, the perpetrators are

12    seriously isolated and mentally unwell people.  And unlike

13    crimes like carjackings or armed robberies, they're not

14    rational actors seeking to achieve some material, tangible

15    benefits for themselves.  And, in fact, oftentimes these events

16    conclude with these people killing themselves.

17          And so there's clearly something else at play here

18    rather than availability of the arms and magazines that are

19    owned by the tens or hundreds of millions in the United States

20    and, generally speaking, don't negatively impact anybody beyond

21    the -- unfortunately, it does impact some people but not in any

22    large-scale way in terms of the population of the United

23    States.

24          THE COURT:  All right.

25          MR. LEHMAN:  And that's all I have, Your Honor.  I

```
 1    just rely on the arguments made already by the others.
 2              THE COURT:  All right.  Thank you, Mr. Lehman.
 3              The State?
 4              MR. IOANNOU:  Good afternoon, Your Honor.
 5              THE COURT:  Good afternoon.
 6              MR. IOANNOU:  Chris Ioannou on behalf of the State.
 7    I'll be handling the threshold common use and whether LCMs are
 8    arms part of the argument, while my colleague, Ms. Cai, will be
 9    handling the historical tradition aspect of the argument.
10              THE COURT:  So, Mr. DiGuiseppe and Mr. Lehman, can
11    you hear Mr. Ioannou?
12              MR. IOANNOU:  Close enough.  Whatever you say it is,
13    it is, Judge.
14              THE COURT:  Well, that's not good.
15              Can you hear him?
16              MR. DiGUISEPPE:  Your Honor, this is Ray DiGuiseppe,
17    not as well as I could hear Mr. Schmutter.  It's kind of dim.
18              THE COURT:  If you can put the mic aside, he'll be
19    able to hear you.
20              MR. IOANNOU:  Can you hear me better?
21              MR. DiGUISEPPE:  Yeah; that's much better.  Thank
22    you.
23              MR. IOANNOU:  Give it a shot.
24              May it please the Court.  You've heard a lot of
25    accusations this afternoon about the State engaging in
```

1    interest-balancing, but the State's arguments do no such thing.

2    Rather, text, history and tradition make clear what the

3    overwhelming majority of courts have concluded after *Bruen*:

4    assault weapons and large-capacity magazines may be banned.

5         Those instruments are not protected by the Second

6    Amendment at all.  And even if they were, they fall comfortably

7    within our nation's historical tradition of regulating weapons

8    that are especially dangerous or prone to disproportionate

9    criminal misuse.

10        As mentioned, I'll discuss some threshold protection

11   questions at step one *of Bruen* while my colleague, Ms. Cai,

12   will discuss the State's historical traditional arguments.  On

13   whether assault weapons and LCMs are protected by the Second

14   Amendment, we have two key points.  First, as *Heller* and *Bruen*

15   hold, the scope of the Second Amendment as originally

16   understood covers only those weapons that are in common use for

17   self-defense, but neither assault weapons nor LCMs are so used.

18        The undisputed record evidence shows that their

19   features are suited for tactical combat, not self-defense -- a

20   reality which is reinforced by those instruments' actual usage.

21        Plaintiffs' exclusive reliance on the number of

22   weapons in circulation is thus irrelevant, leads to several

23   startling conclusions, and has been rightly rejected by both

24   appellate courts to consider it after *Bruen*.

25        Second, LCMs are not protected by the amendment's

1   text for a further reason.  They are historically understood as

2   accouterments, not arms.  And it is again undisputed that,

3   unlike ammunition, LCMs are unnecessary to a firearm's

4   function.  For both of these reasons, assault weapons and LCMs

5   are unprotected.  Thus, this Court can and should grant summary

6   judgment to the State without even needing to canvass the

7   historical regulatory record.

8            THE COURT:  So you're just saying they're not arms?

9            MR. IOANNOU:  Your Honor, we're saying that LCMs are

10  not arms as weapons of offense used to cast out or strike out

11  another, the definition used in *Heller*.  And then we're also

12  saying that neither assault weapons or LCMs are in common use,

13  which is the second requirement to get protection.

14           THE COURT:  Okay.

15           MR. IOANNOU:  So where Mr. DiGuiseppe left off in

16  terms of his summation about common use is actually precisely

17  how I'll track the argument.  First, common use is a predicate

18  for Second Amendment protection on which plaintiffs bear the

19  burden.

20           Second, plaintiffs' theory of common use relying

21  exclusively on instruments' popularity is wrong on the law, not

22  to mention common sense.

23           And third, our theory of common use, which looks to

24  an instrument's objective features and actual uses for

25  self-defense, is consistent with Supreme Court and Circuit

1   precedent and, given the undisputed record evidence on that

2   theory, entitles the State to summary judgment.

3           So, Mr. DiGuiseppe claimed that common use has

4   nothing to do with the text of the Second Amendment, a Second

5   Amendment, but the State disagrees.  In fact, common use is one

6   of -- part of one of -- excuse me.  Part of the first of two

7   steps as the way our Court described to determine the scope of

8   the right.  It's how constitutional rights always work.  You

9   evaluate whether the right's implicated at all; and if it is,

10  you determine whether the burdens on the exercise of that right

11  nevertheless pass constitutional muster.

12          So Mr. Schmutter brought up the First Amendment.

13  What you do in the First Amendment is you ask whether the

14  conduct or the speech at issue was protected at all, and then

15  you shift the burden to determining whether the tiers of

16  scrutiny are satisfied.

17          The same thing with the Fourth Amendment.  A

18  challenger must show that the action was a search in the first

19  place, and then the government has to show whether or not it's

20  reasonable.  It's the same thing here with the Second

21  Amendment.  It's a question of scope, and then only after you

22  show it's within the scope do you apply analogical reasoning.

23  In fact, *Bruen* and *Heller* uses step-one language.  They talk

24  about arms being in common use for self-defense are the ones

25  that get protection.

1            And Mr. Schmutter made a lot of the fact that

2    handguns were in common use, but the State doesn't dispute that

3    handguns are in common use and makes that clear.  In fact,

4    *Bruen* said handguns were in common use and only then did it ask

5    about the State's regulatory record and its burden.

6            And the Third Circuit machine gun case, *Palmetto*, I

7    think it's notable, said that machine guns weren't protected at

8    all without even engaging in any type of scrutiny.  So it's

9    clear that this is a threshold protection question and not

10   something that has to do with the historical record -- the

11   historical regulatory record.  Instead, the common-use approach

12   is consistent with the Second Amendment's original public

13   meaning.  After all, *Heller* and *Bruen* are clear that the Second

14   Amendment codified a preexisting right.  And consistent with

15   that preexisting right, as the Seventh Circuit in *Bevis* made

16   clear, is that only those weapons that were protected were

17   those that were in common use for self-defense.

18           And you looked at other sources of context to get at

19   the scope of the right, such as the English Bill of Rights,

20   Blackstone and other treatises, and state constitutions.

21           Indeed, the Third Circuit in its decision in

22   *Drummond*, which was praised by the *Bruen* Court, talked about

23   when sketching the right scope, our inquiry remains rooted in

24   historical practices.

25           And so that's just something that most constitutional

1    rights get.  You ask whether the right is implicated at all and

2    then you ask whether the burdens are nevertheless

3    constitutionally imposed.  And so all of that is plaintiffs'

4    burden to show as the *Bruen* Court insinuated with its

5    burden-shifting language.

6          And so now whatever -- whoever's burden it is, I

7    think plaintiffs really hang their hats on common use being

8    purely, as Mr. Schmutter said, a question of numerosity.  How

9    many Americans happen to own a given weapon at any given time?

10   But that approach fails for four reasons, I'd say.

11         It doesn't add up to how we do other constitutional

12   rights.  You don't simply count the numbers of -- or you don't

13   poll, for example, the public to determine whether or not a

14   punishment is cruel and unusual under the Eighth Amendment.

15   Instead, you look at whether or not the punishment itself is

16   cruel and unusual.

17         And likewise, as with the First Amendment, you don't

18   count up how many Americans happen to think that child

19   pornography, for example, is protected speech.  Rather, you

20   look at the objective characteristics of the speech to see

21   whether or not it is or is not protected.

22         And it's really weird here when you're just asking

23   about counting or polling gun owners without really seeing

24   whether or not it's an instrument that actually facilitates

25   armed self-defense.

1              And so --

2              THE COURT:  Well, Mr. Schmutter said that that test

3      dealt with typically possessed, you know.  So possessed would

4      mean ownership by somebody, right?

5              So -- I mean, when he was making his argument, I

6      didn't ask the question, I was like, well, how do we figure out

7      how many of these types of weapons are possessed?  But I

8      imagine the industry knows that.  I don't know.  So how do you

9      deal with that argument?

10             MR. IOANNOU:  Yes, Your Honor.

11             I think it's important to note that *Heller* and *Miller*

12     which Mr. Schmutter relied on talked about common use and not

13     just typical possession.  And I think that makes sense.  If a

14     weapon is not typically possessed for self-defense, it

15     therefore is not in common use for self-defense.  But it

16     doesn't work the other way.  A weapon could be in common use,

17     but it's no longer typically possessed by a sufficient number

18     of Americans.

19             For example, the gun that won the West, the

20     Winchester 1873, there are probably not many people carrying

21     those arms or possessing those arms.

22             THE COURT:  Well, or a Bowie knife.

23             MR. IOANNOU:  Or a Bowie knife, exactly.  But that's

24     not how the test works.  You're actually looking at the

25     characteristics of the weapon to determine whether or not they

1    are useful in warfare, as *Heller* discussed, or whether they are

2    actually in common use for self-defense.

3              And so --

4              THE COURT:  So how do you do that?  When, you know,

5    you have these add ons that are a part of the -- I know you can

6    add a bayonet to something, but let's say it's a rifle.  So if

7    you add the -- what are we regulating, the rifle or the

8    bayonet?  I couldn't figure that out.

9              And how do you go about that analysis, where you just

10   take the attachment or whatever it is?  We have those

11   special -- a pistol that can move up and back.  I don't know

12   that much about weapons, I'm sorry to say.  But they have those

13   pistol grips.  They have something that you get a shoulder butt

14   holder or something.  I mean, like how -- why are they

15   regulated?  And how would you figure out they're in common use

16   or not?  I don't know.

17             MR. IOANNOU:  Right, Your Honor.

18             So I think the statute does two things.  First, it

19   restricts a list of enumerated weapons, so like the AR-15,

20   which the Cheeseman plaintiffs in their complaint describe as

21   the paradigmatic example of an assault weapon.  But then it

22   also talks about weapons that are substantially identical to

23   those that are enumerated.  And the Attorney General added

24   guidelines to flesh out what it means to be substantial.

25             THE COURT:  That's Verniero's.

```
 1              MR. IOANNOU:  That's correct, Your Honor.

 2              (Reporter clarified the record.)

 3              THE COURT:  Verniero's guidelines, Peter Verniero.

 4              MR. IOANNOU:  That's right, Your Honor.

 5         And you need to show that there are two of those, at

 6    least two of those features in order to still fall within the

 7    substantially identical.  And so --

 8              THE COURT:  The problem I have with that argument is,

 9    and we all know it, the Legislature had no thought process as

10    to the Second Amendment.  I mean, there was a mass shooting so

11    they decided to put in a bill and they passed it in a few days

12    and here we are, right?

13         So when they were -- if you just look at that action,

14    it would be easy to say, well, they didn't even consider the

15    Second Amendment, let's -- well, why are we even here?

16              MR. IOANNOU:  Your Honor, I think that the

17    Legislature was actually acting entirely consistent with the

18    Second Amendment.  In fact, the features that you've described,

19    things like a bayonet or a grenade launcher or a flash

20    suppressor, all of those things are actually, as our expert

21    witness said, are features that enhance effectiveness in a

22    combat scenario.  And in the Giffords amicus brief, they

23    characterize it as helping prolonged episodes of rapid fire.

24    And so what you have are features like a pistol grip, for

25    example, those are things that facilitate non-shoulder
```

1    shooting.  And so if you are in a mass-shooting situation, it's

2    very helpful to not necessarily be shooting from the shoulder,

3    but from the hip or something that's not as easily wrestled

4    away from.  And so in those situations, you are still firing

5    with just as much precision and power, but actually making it

6    harder to intervene in such a scenario.  And that's kind of the

7    exact feature that the Legislature was getting at in enacting

8    its ban.

9            And so I think that those features are very much

10   consistent with our theory of common use and that they are not

11   actually useful for armed self-defense, but they're, in fact,

12   more useful for armed tactical combat, as our expert evidence

13   shows.

14           I'd like to get back to why -- yes, Your Honor.

15           THE COURT:  I mean, how do you come to that

16   conclusion?  If someone's defending themselves within their

17   house, I think they need something that's accurate, right?  Or

18   they would want something that's more accurate in their

19   shooting, especially if they're -- I mean, I guess if you're in

20   the military or a police officer, you spend some time at the

21   range every year, but who knows what these folks are doing.

22           MR. IOANNOU:  I'll spot you that, Your Honor.  It's

23   good to be precise.  But I think what our evidence shows is

24   that it's akin to -- it's akin to using a sledgehammer to crack

25   open a peanut shell, right?

1          So what Mr. Yurgealitis describes is, you know, even

2     things that hit their targets, going through Sheetrock, for

3     example, and nevertheless hitting a gallon jug of water

4     afterwards, and so you could be precise but still pose dangers,

5     for example, in the home, to bystanders, even if you're hitting

6     your target.  It's that power, that kinetic energy which the

7     Hargarten report also discusses.  And so --

8          THE COURT:  But then we go into the -- what do they

9     call those bullets?  They call them "cop killers"?

10          MR. IOANNOU:  Armor-piercing bullets.

11          THE COURT:  Yeah.  And so that's -- that's not even

12     at issue here, right?

13          MR. IOANNOU:  That's not at issue.

14          THE COURT:  Well, I -- I don't know.

15          MR. IOANNOU:  Your Honor, I think it's still relevant

16     that we're actually looking at whether or not the weapons

17     themselves or their combination of features, however you want

18     to characterize that, are in fact useful for self-defense or

19     better suited for usefulness in warfare, which is exactly how

20     *Heller* contrasted machine guns, for example, which it would be

21     startling to say that they couldn't be banned with handguns.

22     And it went through the objective characteristics of handguns

23     describing why they're the ideal weapon of self-defense.  And,

24     in fact, that's borne out in how Americans actually use those

25     handguns, right?

1          So, for example, as Mr. Klarevas describes in his

2     expert report, handguns are about 50 percent of the civilian

3     gunstock, but as Lucy Allen on the undisputed record evidence

4     discussed about defensive gun uses, 90 percent of the known

5     defensive gun uses are from handguns, right?  So people are

6     using these weapons in accordance with their self-defense

7     features and making them and helping them with exercising their

8     self-defense right.

9          THE COURT:  So -- well, since you're going at these

10    attachments and things like that, I know I approved it at one

11    time, and here we are again, but when you have a magazine of

12    ammo that had a capacity of 15 and you move it down to 10,

13    right, why is that even -- what are we gaining by such a move

14    or such a legislative change?

15         I mean, like, it seems very minimal to me.  And so

16    what are we trying to do?

17         MR. IOANNOU:  Right, Your Honor.  I think the

18    Legislature was very clear in what it was trying to do.  It was

19    simply trying to announce a pause or force a pause for someone

20    who is engaging in the mass shootings that Your Honor expressed

21    concern in its comment to Mr. Schmutter.

22         And as the Court in ANJRPC in the Third Circuit did

23    and discussed, those pauses are a serious moment for people to

24    get out of the way or to intervene.

25         And it's important to also emphasize that the

1    Legislature is not restricting how many magazines someone can

2    own.  It's not restricting how much -- how many rounds someone

3    can own.

4              THE COURT:  I understand that.

5              MR. IOANNOU:  It's just creating a pause.

6              A few more points, Your Honor, on why numerosity

7    can't be the right test.  Mr. Schmutter talked about it being

8    circular and that not being enough.  But I think that's

9    precisely the concerns that both appellate courts, the Seventh

10   Circuit in *Bevis* and the First Circuit in *Ocean State Tactical*,

11   rejected.  Because oftentimes it takes a while for danger to

12   manifest itself in a gun.  So, for example, if people buy a

13   particularly useful weapon for self-defense and only years

14   after does it become clear that there's a fatal design defect,

15   on their theory, you wouldn't be able to ban such a weapon like

16   that, even if it was completely destructive after some amount

17   of time.

18             And so it follows that the law often takes time to

19   catch up to regulations -- to technology and advancement in

20   technology.  And the circularity problem, in fact, on their

21   theory, prohibits something like that from being addressed.

22   And it's clear why the Third Circuit in ANJRPC declared that

23   common use in terms of numerosity is not dispositive.  It cited

24   *Friedman* in the Seventh Circuit opinion showing that this was a

25   circular test.

1          And finally, on numerosity, it's just irreconcilable

2     with the case law on machine guns.  I think it's notable that

3     *Palmetto*, the Third Circuit decision, didn't count up how many

4     machine guns were in the civilian circulation.  It looked at

5     the features and the usage of those weapons and calling them

6     exceedingly dangerous and weapons of war such that it wasn't

7     protected.  And I think it's also the best reading of *Heller*

8     and *Bruen* at the end of the day.

9          As *Heller* described and as Mr. Schmutter discussed --

10    actually, what *Miller*, in restricting short-barreled shotguns,

11    did and *Heller*, in discussing machine guns, it, quote, looked

12    at the character of the weapon and it examined the character of

13    the weapon -- that's on page 622 of the U.S. Reports -- to

14    determine that those were of a kind that were not in common use

15    for self-defense.  It didn't count how many machine guns were

16    in circulation.  It didn't count how many short-barreled

17    shotguns were in circulation, and it didn't count -- and

18    *Palmetto* didn't count how many machine guns were in circulation

19    either.

20         And so I think it's on the State's undisputed record

21    evidence, as Ms. Cai alluded to earlier, that our theory very

22    much entitles us to summary judgment.  As Professor Yurgealitis

23    discusses, these are poor or ill-suited weapons for

24    self-defense, especially for the home.  You're not having

25    lengthy 500-yard range shootouts in the home or even on the

1  street.

2          You're risking overpenetrating the home construction,

3  as I alluded to back in my colloquy with you earlier, and also

4  you require two hands to hold the weapon, which is precisely

5  the kind of characteristic that the Supreme Court deemed

6  relevant in *Heller* when it talked about only having one hand

7  for a handgun so that you can call 911 or take care of a child

8  or something like that.

9          Instead, these instruments are weapons of war.  They

10 have the same automatic -- sorry, semiautomatic fire, the same

11 muzzle velocity, the same effective range as the M16, which

12 *Heller* said may be banned, which the Seventh Circuit also

13 discussed and the First Circuit in *Ocean State Tactical*

14 discussed the relationship between those weapons and explaining

15 why they could be banned.

16         And so I think the undisputed record evidence is

17 clear on our theory of the case, we're entitled to summary

18 judgment.  LCMs and assault weapons are not in common use for

19 self-defense.  You look at how they're actually used and you

20 look at their objective features.

21         And, Your Honor, I'd just like to close by discussing

22 the "LCMs aren't arms" points as a weapon of offense.  I think

23 what's undisputed, in fact, is that arms at the Founding were

24 seen as different from accouterments, also known as

25 accessories, and that things like cartridge boxes which held --

 1    which held ammunition were nevertheless accouterments and not
 2    arms.  Plaintiffs also don't dispute that magazines -- the term
 3    "magazines," which didn't exist at the Founding, shares a
 4    linguistic or, you know, it shares a meaning with cartridge
 5    boxes as something that holds ammunition.  Their only dispute
 6    is that, well, a magazine feeds -- it feeds ammunition into the
 7    gun.  But I think that that's a meaningless distinction,
 8    especially because, you know, we're only looking at the
 9    linguistic or the words that are used.  And as the Third
10    Circuit described in its opinion in ANJRPC-I, a magazine is a
11    holder of ammunition just as a cartridge box is.
12            And so with that, I'd like to turn it over to my
13    colleague, Ms. Cai, to discuss the historical regulatory
14    tradition, unless you have further questions.
15            THE COURT:  No, I don't.  Thank you.
16            Good afternoon.
17            MS. CAI:  Good afternoon, Your Honor.  Let me just
18    test that the counsel on the phone can still hear me.
19            THE COURT:  Mr. DiGuiseppe, can you hear?
20            MR. DiGUISEPPE:  Yes, I can.  Thank you for asking.
21            THE COURT:  I forgot your last name.  I'm sorry.
22            MS. CAI:  Cai.
23            THE COURT:  Ms. Cai.
24            MS. CAI:  If at any point you stop being able to hear
25    me, just interrupt because I don't want to go on for too long

1    with technical problems.

2              MR. DiGUISEPPE:  Great.  Thank you very much.

3              MS. CAI:  Your Honor, I'll start where Mr. Ioannou

4    left off, which is with history.  Even if under *Bruen*'s textual

5    step that Mr. Ioannou just discussed, assault weapons and

6    large-capacity magazines, are covered by the Second Amendment,

7    *Bruen* also makes clear that the Court's inquiry does not stop

8    there.  Instead, it says that modern governments can restrict

9    even those arms that are covered by the Second Amendment if

10   there are relevant historical analogs for that tradition.  So

11   we no longer look to whether the challenged laws today are

12   supported by compelling state interests as we did before Your

13   Honor, or my colleagues did before Your Honor in 2018.

14   Instead, the purpose of this originalist historical inquiry is

15   to examine whether the law would have been seen as

16   constitutional from the perspective of the 18th or

17   19th Centuries.

18             The evidence in this case shows that the answer is

19   unequivocally yes, and the plaintiffs do not meaningfully

20   dispute it.

21             It is amazing to me that the plaintiffs want this

22   Court to disregard history altogether, when *Bruen* instructed

23   courts to prioritize history.  So that's what I want to deal

24   with in my portion of the argument today.

25             This is a case where the record --

1          THE COURT:  Excuse me, before you do that.

2          MS. CAI:  Yes.

3          THE COURT:  Do I -- in applying this test on the

4     Second Amendment, do I go through the common-use portion first

5     and then go to the historical part?

6          MS. CAI:  Yes, Your Honor, you do.  Because *Bruen*

7     itself acknowledged that handguns, as *Heller* said, are in

8     common use.  So that's the first step.  Then it said there's

9     another step which is to see, even if something is protected by

10     the Second Amendment, you still see whether or not there is a

11     historical tradition for the regulation that exists today.  So

12     it's a two-step test.  As Mr. Schmutter says, *Bruen* says it's

13     one step, but it's really -- you can call it 1A, 1B, but it's

14     really two steps, yes.

15          THE COURT:  Whatever.

16          MS. CAI:  Yes.

17          THE COURT:  So just take a handgun for a second.

18          MS. CAI:  Yes.

19          THE COURT:  And I don't know too much about them,

20     right, but if you have a handgun, let's say a Glock, so let's

21     say the Glock has a magazine.

22          MS. CAI:  Yes.

23          THE COURT:  So you could -- right now you could own a

24     Glock.

25          MS. CAI:  Yes.

```
 1            THE COURT:  But if you had a magazine that had 15

 2    rounds, then what is the -- what happens?  Is the magazine

 3    illegal or is the Glock illegal?

 4            MS. CAI:  Your Honor, so what the --

 5            THE COURT:  And how does that make sense one way or

 6    the other?

 7            MS. CAI:  With the caveats that there are certain,

 8    you know, law enforcement, for example, may possess handguns

 9    with higher capacities.

10            THE COURT:  Right.

11            MS. CAI:  And there's an exception for people whose

12    handgun capacities that are over 10 can't be altered, right?

13    There's an exception for those individuals who register them.

14    Putting that aside, the violation of the law is on the size of

15    the magazine, not on the handgun itself.

16            However, when we say "Glock," you know, I think Your

17    Honor meant a semiautomatic handgun without the features that

18    are problematic.

19            THE COURT:  I'm just thinking that's a Glock.

20            MS. CAI:  There are automatic Glock handguns as well,

21    Your Honor.  So -- I've learned a lot about these things.  But

22    I think that's exactly the right kind of inquiry in terms of

23    what the State is regulating, what its features actually are,

24    and how historically not those exact features, right, because

25    those exact features were unlikely to have existed in 1791 or
```

1   1830, but features of other weapons that legislatures found

2   alarmingly dangerous and restricted and whether or not that

3   history existed.  That's the kind of inquiry that we have to

4   undertake under *Bruen*.

5           THE COURT:  See, what came into my mind, and I'm not

6   sure it's -- and I don't even know if it's a reasonable thought

7   in this circumstance, but if, you know, we're talking about

8   features and we're talking about the pistol handle and the, I

9   don't know, the shoulder holder or whatever it is, but I was

10  putting the magazine in that same category as the feature.  So

11  I'm like, well, I'm not sure about these features being

12  constitutional at all, from what I've read anyway.

13          So I don't know how you -- how do you change the LCM

14  from just being one of the features to this now is dangerous?

15  And it's not an arm, so it's just outside of the Second

16  Amendment.  But that doesn't make a lot of sense to me.  I

17  don't know how you do this.

18          MS. CAI:  Your Honor, I think you can think about it

19  one of two ways.  The first way is just as a matter of history

20  legislatively, the Legislature in 1990 had a list of assault

21  weapons that were in existence then, marketed, and had names

22  that could be identified.  But as historical legislatures

23  understood with respect to Bowie knives and slungshots, which

24  are things -- I can't really describe it in great detail, but

25  the expert reports describe it in great detail, they also

```
 1   understood that people could fashion things that are very
 2   similar to the thing that is a Bowie knife.  And so what the
 3   features-based legislation does is prevent copycats.  And so
 4   that is what the Legislature did in 1990.  And you'll see in
 5   the record evidence that we have, and this is not evidence in
 6   the form of like fact evidence, but these are historical
 7   statutes that our historical experts have pointed the Court to,
 8   but the Court can also just look them up yourself, historical
 9   legislatures banned particular weapons but also things that are
10   known as or similar to those weapons as well.  So there is a
11   history for that.
12           THE COURT:  Verniero used substantially similar or
13   something like that?
14           MS. CAI:  Yes, Your Honor.  And I think that was an
15   effort to identify exactly what it is about the firearms that
16   were being produced sometimes in response to, because
17   California, I believe, was the first state to regulate assault
18   weapons.  But manufacturers, and, again, this is outside the
19   record, but since Your Honor asked me, again, to make things
20   that would avoid, you know, they're not this model but
21   something almost exactly similar.  So I think Agent Verniero
22   was trying to respond to that with the guidelines.
23           THE COURT:  So you know what's not helpful to me is
24   the use of the word "assault weapons."  I mean, that's a whole
25   category of things, right?  But don't we have to take each item
```

1    separately and evaluate it under the Second Amendment?

2         MS. CAI:  I think that you -- well, what Your Honor

3    can do is -- when we say "assault weapons," we just mean what

4    the Legislature has enumerated as this category of weapons.

5    And so the through line as a matter of history is the

6    legislatures saw that there were particular types of weapons

7    because of their features, not because of their names or

8    because of, you know, whatever it is or whoever was selling

9    them, but because of what they could do that made them

10   especially dangerous.  And relying on what it knew about public

11   safety just as historical legislatures did what they could

12   based on what they knew about public safety needs of the

13   population, they singled out those particular weapons with

14   those particular features for regulation.  And this is

15   something that American legislatures and English legislatures

16   before the Founding have done for centuries.

17        And so these are weapons that did circulate in

18   civilian populations, not weapons that were only used by the

19   military and therefore were not problems for the Legislature to

20   think about or weapons that inventors had invented and you

21   could go to the museum to see them but were not actually

22   circulating in society.  These are weapons that actual people,

23   civilians had.  And we begin with English laws prohibiting the

24   possession of land scythes, crossbows, and certain short

25   handguns, not all guns, but certain specific weapons.

1                    In the early Republic, American legislatures,

2      different states restricted Bowie knives and slungshots.  And

3      from this history, we also know that the restriction on these

4      arms began after they became a part of civilian markets.

5                    So even if Your Honor were to agree with the

6      plaintiffs' common possession test, these are arms that were in

7      common possession.  People I'm sure would have liked to use

8      them for self-defense, or could use them for self-defense.  A

9      Bowie knife is a long knife that has a hand guard most of the

10     time, and so someone could find that effective for

11     self-defense.  Nonetheless, legislatures restricted them

12     heavily, sometimes banned their possession, or other times, and

13     these are the 1837, as an example, Alabama law, that set a very

14     high tax for any sales, so $100, which is thousands of dollars

15     today, for any Bowie knife to be transferred or sold.

16                   In 1837, Tennessee prohibited any kind of sale, not

17     just putting a tax on them.  And 1850, Massachusetts banned the

18     manufacture or sale of slungshots and so on and so forth.  So

19     these are legislatures that singled out these particular

20     weapons because it found them to be particularly dangerous as

21     well as the copycats.

22                   And so I think this is the type of historical

23     evidence that is in the record.  Our expert historians also

24     provide context about how these laws came about, what were the

25     reaction to them, so on and so forth.  You don't necessarily

1    need that, Your Honor, to rule for the State because these are

2    just laws that you can find on -- you know, and it's cited in

3    our briefs.

4            By contrast, there is no historical support for the

5    idea that legislatures only restricted weapons that were rarely

6    possessed by civilians, which is what the plaintiffs are

7    arguing is the only test allowable under *Heller* and *Bruen*.

8            And I think that makes sense because legislatures

9    wouldn't need to do that.  If very, very few civilians had

10   weapons, they wouldn't -- particular types of weapons, that

11   doesn't pose enough of a policy concern for legislatures to

12   address.

13           THE COURT:  But I thought Mr. Schmutter was saying --

14   I don't know.  When I did my reading over the last few days, I

15   thought he was saying not rarely possessed, but they were not

16   as popular as others, arms or weapons, but they were dangerous

17   in nature.  So didn't you have to find both things; that they

18   were -- they may have been -- whether they were common or rare

19   and, B, whether they were dangerous or whatever?

20           MS. CAI:  Yes, Your Honor.  I'm not quite sure what

21   Mr. Schmutter's standard for dangerous enough would be.  But if

22   he is adding those two things together, then I think you would

23   have an even less -- more of a straitjacket, so to speak, on

24   legislatures.  Because if they could only restrict things that,

25   in Mr. Schmutter's words, were highly unusual and they also had

1    to be dangerous, then you wouldn't really be legislating on

2    much of anything at all because very few people would be -- you

3    know, there would be very few reasons to identify weapons that

4    nobody really had.  And that's the only point that I'm making,

5    Your Honor.

6              THE COURT:  Well, where I have trouble with your

7    argument is if you go back to Bowie knives, and they're

8    considered to be dangerous and not common or whatever, you

9    could regulate everything.

10             MS. CAI:  Your Honor --

11             THE COURT:  I mean, there's nothing that you couldn't

12   regulate as far as I could see.  If you have a Bowie knife, why

13   not a handgun?

14             MS. CAI:  Your Honor, I think today, the analysis

15   would be very different because the features of a Bowie knife

16   may not be especially dangerous.  But as Professor Spitzer's

17   report explains, back in 1830, a Bowie knife was actually way

18   more effective as a weapon of offense than a handgun would have

19   been.  And that's because handguns at the time, at least the

20   types that civilians could access and buy, were single-shot.

21   They were highly unreliable.  They had to be loaded from the

22   muzzle.  And so you had to put highly corrosive black powder in

23   them, which you may not be able to do at a moment's notice.

24   And so compared to other weapons that civilians had access to,

25   legislatures found Bowie knives to be actually more dangerous

 1 | than the handguns that were available then.

 2 |         And so I think the analysis -- the standard that

 3 | *Bruen* and *Heller* say is whether or not they're in common use

 4 | for self-defense today.  And so if you put yourself in the

 5 | shoes of an 1830s legislator, you would think -- and I think

 6 | that's what the history bears out -- that Bowie knives were

 7 | particularly dangerous even compared to other firearms, but

 8 | that's just because firearms at the time were not especially

 9 | dangerous because they could not be used effectively for

10 | offense.

11 |         Now, they could be if you had a bunch of people

12 | together in the war and using them synergistically, but an

13 | individual going out and about their day or in their homes

14 | wouldn't have the ability to shoot from the firearm because the

15 | firearm would be unlikely to be loaded because you need to take

16 | the dry powder and put it in and all that.  So this is why the

17 | historical evidence really does matter in this case, because it

18 | helps inform the background conditions for which legislatures

19 | made their decisions at the time.  Without that historical

20 | context, us sitting here today would not necessarily know why

21 | it is that legislators thought particular weapons in 1820 or

22 | 1850 or 1771 were especially dangerous.

23 |         THE COURT:  All right.

24 |         MS. CAI:  And I just wanted to make one final note on

25 | what the history shows in terms of the regulations on

1    especially dangerous firearms, which is that it extends all the

2    way to the 20th Century restrictions on automatic weapons and

3    large-capacity semiautomatic weapons.

4            I think the tradition certainly started way before

5    the 20th Century, but it is an unbroken line from the English

6    history to the 20th Century.

7            And under the plaintiffs' position, it's the same

8    historical tradition that we would rely on for the firearms

9    regulated under New Jersey law challenged today as we would be

10   on restrictions on automatic weapons.  It's all the same

11   historical tradition.

12           So under plaintiffs' argument, if Your Honor accepts

13   it, that would result in Second Amendment protection for

14   automatic weapons, which *Heller* said would be a startling

15   conclusion.  The same thing for short -- for sawed-off

16   shotguns, for armor-piercing bullets, all of these things, if

17   they are chosen by enough people in terms of sales, would

18   automatically get protection under plaintiffs' theory even

19   though the history suggests that legislatures thought that they

20   could be banned as far back as before the Founding.

21           And a number of other courts, including the two

22   federal courts of appeal to have ruled on this issue

23   post-*Bruen*, that's the First Circuit in *Ocean State Tactical*

24   and the Seventh Circuit in *Bevis*, as well as nine other federal

25   district courts by my count agree and rejected similar claims.

1          THE COURT:  So is there like a window of what -- so

2     some things you think you can't regulate, like handguns, right?

3     And you think that others are regulated like machine guns,

4     right?  So we didn't have just this window in between of what

5     are allowable and what may be banned, I guess.  So what we're

6     doing here, are we just knocking out some of those particular

7     items in the middle, or what are we doing from an overall

8     perspective?

9          MS. CAI:  Yes, Your Honor.

10         THE COURT:  And are we -- is that what we're going to

11    do every year, is the Legislature will pass another one and

12    we'll see whether we deal with that?  What's going to happen

13    with this?

14         MS. CAI:  I don't think -- certainly the cases about

15    the in-between areas are the ones that certainly take the most

16    analysis to get through.  But I think the answer here is

17    actually fairly straightforward.  Because plaintiffs agree that

18    the features of an AR-15, which they claim is the prototypical

19    assault weapon or the weapon that is banned by the State, have,

20    other than the ability to fire in automatic mode, the exact

21    same features as the M16, the automatic weapon that *Heller* and

22    *Miller* and all these cases said can be banned.

23         So, for example, and this is our statement of

24    undisputed facts 69, which they agreed to, the AR-15 has

25    approximately the same muzzle velocity, which is how fast the

1    ammunition comes out, as the M16, and the same rate of fire as

2    the M16 if you set the M16 on semiautomatic mode.  So the

3    Cheeseman plaintiffs agreed with this.  The ANJRPC and Ellman

4    plaintiffs say it's disputed, but they only disputed that it is

5    irrational to single out semiautomatic rifles for prohibition,

6    which is not a response to the actual fact at issue, right?

7    And so if you look at what the evidence actually shows, there

8    really are not disputed facts about the ability -- about the

9    similarity between the AR-15 and the M16 other than the

10   automatic mode.

11          Now, I acknowledge that of course you cannot shoot as

12   fast with an AR-15 as an M16 in automatic mode.  However, that

13   is the only distinction.  And we know that the military, based

14   on the historical -- on the record evidence, that the military

15   also tends to use the same weapon on semiautomatic mode as

16   well.  So these are now approximating weapons reserved for the

17   military which under *Heller* and its discussion of *Miller*, even

18   though *Miller* is an old case, certain kinds of weapons are

19   simply, quote, not eligible for Second Amendment protection.

20   And that is because these are weapons that are reserved for the

21   military.  And I think the Seventh Circuit case explains this

22   very well in great detail.

23          THE COURT:  So you talk about the AR-15, but let's

24   say you have an AR-15 and you can only put a magazine that has

25   10 bullets in it, so you're reducing the rate of speed with

1    which one can, I don't know, go consume bullets or shoot

2    bullets.

3              MS. CAI:  You're correct, Your Honor.

4              THE COURT:  So then why not let them have the AR-15

5    and just limit the number of bullets?

6              MS. CAI:  Yes, Your Honor.

7              THE COURT:  Why do you have to do both?

8              MS. CAI:  So, Your Honor, I think there's two issues

9    with that.  The first is, it's true, if you only have 10 rounds

10   in a magazine, the amount of time it would take to shoot them

11   is the same, but you would have to switch out the second

12   magazine.  However --

13             THE COURT:  Which takes up time.

14             MS. CAI:  It does take up time.  However --

15             THE COURT:  And if you're in your house at night and

16   there's an intruder, you might not know where the second

17   magazine is.

18             MS. CAI:  Your Honor, that --

19             THE COURT:  I'm just -- I know, I'm just throwing it

20   out.  But I think that could happen.

21             MS. CAI:  Sure.  It's possible.  But it's also

22   possible that if you're in your house, you may not know where

23   the gun is, et cetera.  But that's not what the empirical

24   evidence bears out.

25             So the unchallenged, in terms of opposing evidence

1    from their side, evidence shows that actually the rate, and

2    this is not just Ms. Allen's study for this case but also other

3    individuals studied on similar datasets for a different period

4    of time and corroborated by other analyses, people don't shoot

5    more than five bullets for self-defense hardly ever.

6          And so the idea that you would need to shoot ten

7    rounds to protect yourself is a hypothetical that is not borne

8    out by evidence.

9          And as we have explained to Your Honor and Your Honor

10    knows from 2018, it's not a restriction on how many bullets you

11    can possess or how many magazines you can possess.

12          THE COURT:  No; I understand that.

13          MS. CAI:  It's on whether or not they're in the

14    same --

15          THE COURT:  No.  My question was really going to the

16    AR-15.

17          MS. CAI:  Yes.

18          THE COURT:  I mean, because you're asking me to

19    uphold the prohibition on an AR-15.  And I'm saying, well, if I

20    uphold it on the LCM, why do I have to prohibit the weapon?

21          MS. CAI:  I think, Your Honor --

22          THE COURT:  I mean, what's the reason?

23          MS. CAI:  Yes, Your Honor.  I think the reason is

24    even a ten-round magazine on an AR-15, because of the rate in

25    which you can expend those ten rounds of ammunition, is already

```
1    extremely dangerous.  You're really thinking about a scenario

2    where someone is trying to choose a weapon that has that

3    feature probably for a purpose that is not lawful self-defense

4    in terms of actual use of that weapon.  Because that feature is

5    not useful generally for someone who is just in their home.

6    Rather, it is useful for someone who is trying to use that for

7    unlawful purposes.

8             And I think some of the other features Your Honor

9    mentioned, so, for example, the folding or telescoping stock,

10   allow a rifle to be folded up and transported.

11            Now, the idea of using it for self-defense in the

12   home does not require that particular feature, right?  It's a

13   feature that would only be helpful if you're trying to take the

14   AR-15 with you.

15            (Phone beeping.)

16            MS. CAI:  I think we may have lost somebody.

17   Hopefully it's not counsel.  There are a few other folks from

18   my office on the line, so it may just be them.

19            THE COURT:  Okay.

20            MS. CAI:  And so I think the features, and the ATF --

21   former ATF expert Yurgealitis talks about this in his report,

22   each of those features allow the shooter to achieve a

23   consistent rate of rapid fire.  And so that is the kind of

24   thing that a home self-defense civilian is not doing.  Instead,

25   it really enables someone who is using the weapon for nefarious
```

1   purposes.

2          I will also submit, Your Honor, that the same

3   arguments that plaintiffs are making, you can apply them to a

4   short-barreled shotgun.  You can apply them to an automatic

5   weapon, right?  Because if you limit the magazine capacity on

6   an automatic weapon, sure, you could only shoot ten bullets.

7   It would pause your time.  But I don't think that is the

8   limitation that the Supreme Court had in mind when it said that

9   restrictions on -- to say that the Second Amendment protects

10  automatic weapons, that would be a startling conclusion.

11         So I think what the Supreme Court is asking courts to

12  do on the second historical step is to see whether or not there

13  is a historical tradition of relevantly similar restrictions.

14  And I think that's very much borne out by the undisputed

15  history here.

16         Just to --

17         THE COURT:  Counsel, it's hard to analyze or I mean

18  accept that the regulation of a Bowie weapon or a Bowie knife

19  is the same as what we're doing with arms or semiautomatic

20  weapons.

21         MS. CAI:  I would have to disagree, Your Honor,

22  because it is a class of weapon that is being either prohibited

23  or prohibited from being sold or manufactured.  And that's

24  exactly what plaintiffs complain is happening in this case.

25  And so, yes, a Bowie knife is a different weapon than an AR-15,

1    but its prominence in the minds of legislators at the time is

2    similar in terms of its effect on public safety.

3            And, Your Honor, you don't have to look at Bowie

4    knives.  You can look at what English legislatures thought

5    about lances or crossbows or particularly short guns.  And I

6    think that's the type of thing that you may have in mind.  But

7    I will also note that the moment that the proliferation of

8    automatic weapons entered the market in the early part of the

9    20th Century, legislatures restricted those as well.

10           Now, plaintiffs would say, well, you can't look at

11   20th Century history.  And that would be true if automatic

12   weapons existed for centuries beforehand and nobody regulated

13   them.  We would have a bigger problem.  But the problem is,

14   they didn't exist, even on plaintiffs' telling, until the late

15   19th Century, and at that time were not circulated in the

16   civilian population.  So we have to take the history and extend

17   it back to see how long the tradition is.

18           THE COURT:  No; I understand that.

19           MS. CAI:  Okay.  I'll make just one quick note on the

20   presence of dramatic social and technological change that *Bruen*

21   discussed.  To be clear, I think Your Honor can uphold the laws

22   without this part of the analysis, but because *Bruen* said

23   courts don't need to ever search for historical twins but

24   rather just need historical laws that are relevantly similar,

25   it also said that courts can sort of level up the level of

1    generality in terms of the lens that it's looking at, you know,

2    a wide lens or a very fine lens, depending on whether or not

3    the regulatory challenges proposed by firearms today implicate

4    unprecedented societal concerns or dramatic technological

5    changes.  And I'll note that *Bruen* said other cases may

6    implicate these, and it said its legal standard applies to

7    those cases.  So I think Mr. Schmutter has to be wrong when he

8    says *Bruen* doesn't apply to other cases.  This is the other

9    case.

10         And I think the dramatic technological change doesn't

11   need to be repeated too much here.  The undisputed record shows

12   that the technology of assault weapons and LCMs today, it's

13   just far more lethal and powerful than the Founders could have

14   imagined.

15         I'll just note, I already talked about the similarity

16   of M16s, but I'll also note that the ER physician who did an

17   experiment with tommy guns, muskets, other handguns and an

18   AR-15 demonstrated their effect on simulations of human tissue

19   to show how different and how much more powerful AR-15s are in

20   that regard.

21         You know, the plaintiffs say we disagree with the

22   analysis, but that's not -- they don't have any disputed

23   evidence to go against this expert evidence that is the result

24   of an empirical test and things like that.  So I think that's

25   very important.

1          On social change, we are not arguing that because

2     mass shootings exist, legislatures can do whatever it wants to

3     respond to mass shootings.  That is not the argument.  And

4     we're not arguing, as we did in 2018 before Your Honor, that

5     this law is a particularly good solution for mass shootings.

6     We already won that argument, and we're not here for it because

7     *Bruen* says that's not what you look to.  Rather, *Bruen* says if

8     you have a new social problem, you just look at the history

9     with a less fine lens.  And I think it's indisputable that mass

10    shootings are a new problem that the Founders could have never

11    imagined.

12          Shootings perpetrated by one or two individuals on a

13    large group of people in a very short period of time, that was

14    simply not possible at the Founding, and it is made available

15    by these technologies that we have today.

16          And on that, I'll just end on a note in response to

17    Your Honor's comment, which I know Your Honor probably didn't

18    want to make it a big deal, but I'm not actually commenting on

19    what legislatures are doing or not doing, but I'll make two

20    points because it reminds me of things that are relevant to

21    this case.

22          The first is that plaintiffs' counsel is using

23    similar arguments they're making today across the nation, not

24    them particularly, I'm saying plaintiffs' counsel in these

25    types of cases --

```
1           THE COURT:  I know.

2           MS. CAI:  -- to challenge basically every policy

3    option in the Legislature's toolbox to try to solve the problem

4    of gun violence.  And so I think what Bruen made very clear

5    though is that -- and Your Honor was absolutely right when you

6    mentioned this -- states can still regulate firearms to solve

7    public safety problems.  It said that the Second Amendment is

8    not a straitjacket and it can and must apply to circumstances

9    beyond the ones that the Founders anticipated.

10           The second point I'll make is the importance of

11   expert testimony and the Rules of Civil Procedure and how we

12   evaluate facts in federal courts.

13           Mr. Schmutter brought up an article by Mr. Lott from

14   the 1980s.  I'm not here to dispute whether he's right or

15   wrong, but I will say that article has been thoroughly debunked

16   by other scholars, including Ian Ayres and John Donohue.  I'm

17   not here to say I'm right or he's wrong, but this is why courts

18   have to subject these types of disputes to expert analysis.

19           THE COURT:  All of the experts are.

20           MS. CAI:  I'm sorry, Your Honor?

21           THE COURT:  All of those experts are.  I had a trial

22   here a few years ago --

23           MS. CAI:  Yes.

24           THE COURT:  -- and they were all over the lot.

25           MS. CAI:  Yes.  And so --
```

```
 1              THE COURT:  So it was hard to figure out what was
 2    right and wrong.
 3              MS. CAI:  I agree, Your Honor.  And that's why the
 4    presentation of evidence before courts under the Rules of Civil
 5    Procedure are important.  Counsel argument saying, you know,
 6    this is right or this is wrong, which is the vast majority of
 7    the plaintiffs' evidentiary submissions in this case, simply
 8    cannot be considered by this Court.  Our briefs talk about that
 9    in great detail.
10              And so when you put the inadmissible evidence aside,
11    when you put aside counsel argument as opposed to actual
12    evidence and when you look to what the genuine issues of
13    material fact are, you'll find that the ones that are
14    undisputed allow you to rule for the State on summary judgment.
15    And I think that's why we urge the Court to do so.  And I'm
16    happy to answer any other questions.
17              THE COURT:  No; I'm good.  Thank you.
18              MS. CAI:  Okay.  Thank you, Your Honor.
19              THE COURT:  I need to let Mr. Schmutter have a turn
20    now.
21              MR. SCHMUTTER:  Thank you, Judge.  I'll try to be
22    quick.
23              I have to be completely honest, as a gun owner
24    myself, it is very difficult to sit here and listen to some of
25    the incredible inaccuracies that the State is saying about
```

1    guns.  In fact, there are quite a few gun owners in the

2    courtroom today and I'm sure in their minds they're thinking

3    the same thing I'm thinking.  They can't believe some of the

4    things that are being said by the State.  They're just wrong.

5            If the Court wants the best possible education on

6    firearms on this record, all the Court needs to do is look at

7    the testimony of Emanuel Kapelsohn, both his initial report and

8    his rebuttal report.  Kapelsohn has 45 years of working with

9    firearms, writing about firearms, researching about firearms,

10   teaching about firearms.  The man knows more about guns than

11   everybody in this room put together.  So the initial

12   declaration of Emanuel Kapelsohn and the rebuttal declaration

13   of Emanuel Kapelsohn will tell you everything you need to know

14   about guns to decide this case.  That's the place to go.

15           I mean, like, some of the things that my friend on

16   the other side said compared -- by the way, I don't know if the

17   Court understands, AR-15s are not illegal in New Jersey.  It's

18   AR-15s with the features, the statutory features.  I have an

19   AR -- I have three AR-15s at home.  They just don't -- the

20   reason they're not illegal is they don't have threaded muzzles,

21   adjustable stocks, flash suppressors, all of those

22   quote-unquote evil features.

23           I'm telling Your Honor, and I know this is not

24   evidential, but if someone's breaking into my home, I'm

25   reaching for my AR-15.  I'm going to defend my home with my

1    AR-15, no question in my mind.

2          So, you know, counsel, my friend on the other side

3    says, well, you don't need -- you're not defending 500 yards,

4    you're not defending, that's not the point.  And, again,

5    Mr. Kapelsohn explains this exquisitely.  The AR-15 platform

6    and all of the firearms like it are excellent at every range.

7    You don't need to be at 500 yards to take and pull out your

8    rifle and defend yourself.  At 20 yards, at 10 yards I'd rather

9    have my AR-15.  And Mr. Kapelsohn explains all of this

10   beautifully.  And what he explains is that rifles are always

11   better at defending yourself than handguns.  Handguns are weak.

12          The only reason I have my handgun is so to make sure

13   I can make it to my rifle, because my handgun is in a box and

14   it's easier to get to, you know, in my house.  I reach for my

15   handgun just to make sure I make it to my AR.  But there is no

16   question in my mind I'm going for my AR if I want to defend

17   myself against an intruder.  And it could be one intruder, it

18   can be two intruders, it could be four intruders, it could be a

19   gang.  It could be lots of people.  I'm not taking any chances.

20   And that's why people overwhelmingly choose these arms, because

21   they know that they're the best chance they have at defending

22   themselves against violent crime.  And that's why the Supreme

23   Court has so emphasized that it's up to the people to choose

24   what they use for lawful purposes.

25          My friend on the other side said something absolutely

1   astonishing, "disproportionate criminal misuse."  That is not

2   the rule.  The State has just made up a brand new rule.  There

3   is no disproportionate criminal misuse rule.  That's not how it

4   works.  The Supreme Court has never said anything of the type.

5   And it goes back to exactly what we've been arguing.  Under the

6   Second Amendment, you do not look at what criminals do.  You

7   look at what law-abiding people do.  It's entirely about the

8   law-abiding people.  And they're not allowed to say, well,

9   criminals do X, Y and Z and therefore we can justify our law.

10  No.

11          What the Supreme Court has instructed is that you

12  look at what law-abiding people do, the choices they make.

13  Criminals do terrible things.  But everything in the Bill of

14  Rights allows criminals to -- hampers and handcuffs the State

15  in their law enforcement efforts.  We talked about this the

16  first time around, so I'm not going to repeat it.  But every

17  right that is an individual right protected by the Constitution

18  in some way takes options off the table for the State.

19          So that's not -- the fact that they're trying to

20  achieve the notable goal of reducing crime is not the

21  constitutionally significant issue here.

22          I'll just briefly talk about Bowie knives, and I know

23  Your Honor is skeptical about Bowie knives, but importantly,

24  we've talked about *Lara vs. Commissioner Pennsylvania State*

25  *Police*.  That is now the law of the Circuit.  *Lara* is now the

1    law of the Circuit.  The relevant time frame for any kind of

2    historical analysis is the 1791 time frame.  18th Century,

3    especially the State's cases which are mid to late

4    18th Century, that is off the table in the Third Circuit.  You

5    cannot use analogies from mid to late 18th Century.  That is

6    off the table.  It's 1791.  The Third Circuit is the first

7    circuit to make that call.  We now know that that's the

8    governing law.

9              And when you look at 1791, the Founding time frame,

10   there is nothing, there is nothing.  There were no bans.  They

11   didn't ban arms.  Maybe they regulated how people could do

12   certain things.  Maybe they regulated the type of people who

13   could possess arms under certain circumstances.  Maybe they

14   regulated the circumstances, but they didn't ban arms.  And

15   even the State's cases are mostly not bans.  They're mostly

16   how, when, where and who.  That's not the same as here.  These

17   are outright bans of these arms.  So none of that, even if the

18   Court goes past the common-use test and goes to the State's

19   historical analogs, none of them are valid under *Bruen* and

20   under *Lara*.

21             THE COURT:  So are you saying every analog has to go

22   back to 1791?

23             MR. SCHMUTTER:  Or thereabouts, yeah.  That --

24   that's -- so let's look at *Bruen* real quick.  *Bruen* explicitly

25   said that they were not deciding which time frame matters.  The

1    reason that there are two time frames at issue is because 1791

2    is when the Second Amendment was ratified, right?  So original

3    public meaning for the Second Amendment is 1791 and

4    thereabouts.  It doesn't have to be exactly 1791, but it has to

5    be close, right?  But for the Fourteenth Amendment, which is

6    why the Second Amendment applies to New Jersey, that's 1868.

7        So the Court says, they recognize that there's a

8    scholarly debate as to which time frame is relevant.  However,

9    if you go and look at that section in *Bruen*, and I would

10   recommend the Court to do that, look at their 1791 versus 1868

11   discussion.  They very clearly say there are not two Second

12   Amendments, not one that applies to the federal government and

13   one that applies to the states.  It's the same Second

14   Amendment.  And so it couldn't be the case that original public

15   meaning in 1791 changes in 1868 because the federal government

16   is unambiguously subject to the 1791 original public meaning,

17   states can't be subject to something different.

18       The reason the Court in *Bruen* didn't have to make

19   that decision is because the history was the same in both time

20   frames, but in *Lara* it wasn't.  In *Lara*, it was dispositive as

21   to which time frame you looked at.  And the Third Circuit says

22   no, it's 1791 or thereabouts.  We don't look to mid or late

23   19th Century.  We don't look at the time of the Reconstruction

24   Era.  We don't look at the Fourteenth Amendment time frame.  We

25   look at the Founding time frame.  That's the law of the

 1   Circuit.  And that's critically important.

 2            One more thing I'd like to say on common use.  Common

 3   use is not -- saying that the common-use test is the only test

 4   that matters isn't discarding the historical inquiry.  It is

 5   the historical inquiry.  The textual inquiry is not the

 6   common-use test.  The textual inquiry that is part one of *Bruen*

 7   is when *Heller* says the Second Amendment applies, prima facie,

 8   to all bearable arms.  All bearable arms.  That's the first

 9   part of what *Heller* says, before they get to common use.

10   That's the textual part.  Common-use analysis is the historical

11   analysis.

12            Our argument isn't that *Bruen* doesn't matter.  Our

13   argument is that this two-step *Bruen*, text and then history,

14   was already done in *Heller*.  The text is all bearable arms are

15   prima facie protected by the Second Amendment.  The historical

16   analysis is arms that are typically possessed by law-abiding

17   individuals for lawful uses cannot be banned.  That's the

18   historical part.  And it's done.  And *Heller* did it already.

19   You don't do it again, as the State is trying to do.

20            Judge, I think that's really all I wanted to say.

21            THE COURT:  All right.

22            MR. SCHMUTTER:  Thank you, Judge.

23            THE COURT:  Thank you.

24            Mr. DiGuiseppe, do you have anything to add?

25            MR. DiGUISEPPE:  Yes, Your Honor.  Thank you for your

1    time further.  I won't take too much more of it.

2            I just would like to highlight on the textual

3    question when we're talking about assault firearms, that it's

4    notable that the State makes no argument at all about the

5    actual textual coverage, in the sense of saying that they're

6    not covered under the text.  That's the only argument they

7    make.  That's why they're not in this common-use notion.  When

8    we talk about that prong, the textual prong, is really coming

9    from recognition in *Bruen* where it said that in keeping with

10   *Heller*, we hold that the Second Amendment plain text covers an

11   individual's conduct, the Constitution presumptively protects

12   that conduct, period, that's it.

13           The difference between *Heller* and *Bruen* on this point

14   and the reason why *Bruen* maybe can be misconstrued, and is

15   being misconstrued in this way, is that *Heller* dealt with bans

16   like we have here.  *Bruen* dealt with a constraint or

17   restriction on carry.  So in the section in *Bruen* which means

18   where they were relying upon for purposes of trying to make

19   this common use as part of the textual test argument, the Court

20   basically is saying that it wasn't disputed that the arms at

21   issue were in common use.  So we can move past that and go on

22   to the question of whether the plain text covers the conduct,

23   which was "carry."

24           So we're talking about two different things here.

25   And *Bruen* itself makes quite clear that the textual argument is

1    just about the text.  And there's no dispute that the text

2    covers the assault firearms.

3           On the mass shootings issue, I wanted to point out

4    something there as well.  I think it's notable and should be

5    recognized that the State's only argument about why mass

6    shootings matter in this context is focused on LCMs,

7    large-capacity magazines, that's it.  They don't make any

8    arguments about how mass shootings are connected to or how

9    these laws would somehow clearly connect with the assault

10   firearms at issue.  They're talking about things like being

11   able to impose a pause or slowing down the rate of fire, all

12   about the number of bullets within a magazine.  And we don't

13   concede for a moment that the LCMs can be banned, too.  It's

14   just not in the context of our claims.  It's just to note that

15   as to assault firearms, there's been no argument at all by the

16   State that there's actually a connection with mass shooting in

17   that regard.

18          And in fact, the common use, I would say, too, that

19   the complaint of the State that this is a circular argument,

20   that common-use law, common possession, that same argument was

21   made in the dissent in the SCOTUS case that this was a circular

22   argument, it was a race between the manufacturers and the

23   purchasers and all of that, and it was rejected.  So to the

24   extent it could be entertained as circular or logically

25   problematic, which we contend it's not for the reasons stated,

1    that was rejected.  And the law is, and it must be, that common

2    use means common possession.

3            Again, we have to recognize that, because if it were

4    not the case and it were the test that the State advocates, the

5    handguns at issue in *Heller* could be banned and would be banned

6    because there's no way anybody could show that they are

7    commonly used in the sense of the same level as numerosity for

8    purposes of actually shooting in self-defense.  It's about

9    keeping and bearing for purposes of being prepared in case of

10   confrontation.

11           THE COURT:  All right.

12           MR. DiGUISEPPE:  And the last argument I would make

13   is about the State's focus on the rate of fire and velocity for

14   purposes of trying to draw a comparison between AR-15s and

15   M16s.  You know, that whole rationale in the way it's

16   articulated, if you look at it, leaves us down or would lead us

17   down a slippery slope where eventually the argument could

18   become and could be used as a justification for banning all

19   semiautomatic firearms.  And so that's the last thing I would

20   have to say.

21           And I would adjoin Mr. Schmutter's points about the

22   historical issues.

23           THE COURT:  All right.  Thank you.

24           How about Mr. Lehman, did you have anything to add?

25           MR. LEHMAN:  I have nothing additional to add, Your

```
 1    Honor.  Thank you for the opportunity.
 2              THE COURT:  Okay.  Thank you.
 3              So how is -- the State, did you want to make a
 4    response?
 5              MS. CAI:  Only to one of the new points that
 6    Mr. Schmutter raised.
 7              THE COURT:  One point.
 8              MS. CAI:  Very quickly.  Yes, Your Honor.
 9              And I promise to keep it very brief.
10              THE COURT:  Thank you.
11              MS. CAI:  The point is the argument about Lara, which
12    is the Third Circuit decision that Mr. Schmutter just brought
13    up.  Two points, the first is that it's not an argument that
14    applies with any force to this case, because our evidence is
15    not all from after Reconstruction.  We have evidence from
16    before, during --
17              THE COURT:  Oh, I know that.
18              MS. CAI:  -- and after Founding.
19              So the Bowie knife thing that he was talking about,
20    those laws started in the 1830s which is Founding Era.
21              THE COURT:  Yeah.  I gotcha.
22              MS. CAI:  Okay.  And with respect to what Lara
23    actually said, I don't think that it's reasonably read to say
24    you never look at evidence after 1791, rather in that case the
25    Court saw, based on the evidence in that case, a conflict
```

1   between the two.  Here, we don't have a conflict.  We have a

2   long range on the same --

3            THE COURT:  I was going to go back and read it

4   because I wasn't sure.  But I knew you had cited to statutes or

5   laws before 17 -- or 1868 or whatever it was.

6            MS. CAI:  Yes, Your Honor.

7            And that's the same tradition that you would have to

8   think about for the weapons that we're discussing today or

9   automatic weapons or short-barreled shotguns or any of those

10  other weapons.

11           Thank you, Your Honor.

12           THE COURT:  Okay.  Thank you.

13           So hopefully someone will order the transcript,

14  because I'd like to have it for my writing.

15           MS. CAI:  Sure.

16           MR. SCHMUTTER:  We'll work that out, Judge.

17           MS. CAI:  We can work that out.  Thank you, Your

18  Honor.

19           THE COURT:  All right.  Thank you.

20           All right.  Have a good evening.  Thank you for

21  coming in.

22           MR. SCHMUTTER:  Thank you, Judge.

23           THE COURTROOM DEPUTY:  Please rise.

24           MR. DiGUISEPPE:  Thank you, Your Honor.

25           MR. LEHMAN:  Thank you, Your Honor.

1          MR. IOANNOU:  Thank you, Your Honor.

2          MS. CAI:  Thank you, Your Honor.

3          (Proceedings concluded at 6:13 p.m.)

4          - - - - - - - - - - - - - - - - - - - -

5     **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
           - - - - - - - - - - - - - - - - - - - -

6      I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled matter.

8

9

10  /S/John J. Kurz, RDR-RMR-CRR-CRC                April 19, 2024

11  Court Reporter/Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25